**UNITED STATES of America, Plaintiff,**

v.

**Gregory J. DePALMA, Eliot H. Weisman, Richard Fusco, a/k/a "Nerves", Murad Nersesian, a/k/a "Mike Fusco" and "Mickey Coco", Leonard Horwitz, a/k/a "The Fox", Laurence I. Goodman, Salvatore J. Cannatella, Louis Pacella, a/k/a "Louie Dome", Anthony Gaggi, a/k/a "Nino", and Thomas Marson, Defendants.**

**No. 78 Cr. 401.**

United States District Court,
S. D. New York.

Aug. 25, 1978.

See also, D.C., 461 F.Supp. 800.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y. by Nathaniel H. Akerman, Scott G. Campbell, Asst. U. S. Attys., New York City, for plaintiff.

Robert L. Ellis, New York City, for defendant DePalma.

Grand & Ostrow by Norman S. Ostrow and Frank H. Wright, New York City, for defendant Weisman.

Martin B. Adelman, New York City, for defendant Fusco.

Murray Richman, New York City, for defendant Nersesian.

Jonathan W. Lubell, New York City, for defendant Horwitz.

Litman, Friedman, Kaufman & Asche, New York City, for defendant Goodman by Herman Kaufman and Richard M. Asche, New York City, of counsel.

Segal & Hundley, New York City, for defendant Cannatella by Marvin B. Segal, New York City, of counsel.

Barry I. Slotnick, New York City, for defendant Pacella.

James M. LaRossa by John Mitchell, New York City, for defendant Gaggi.

Gregory J. Perrin, New York City, for defendant Marson.

SWEET, District Judge.*

The Indictment in this action was filed on June 2, 1978 and alleges a pattern of racketeering activity by the defendants center-

---

* At the request of the Court portions of the original opinion that have little precedential value have been omitted. The footnotes and internal divisions of the opinion have been renumbered.

ing on the corporate enterprise known as the Westchester Premier Theatre ("the Theatre") (Count One), a securities fraud (Counts Two through Twelve), a bankruptcy fraud (Counts Thirteen through Twenty-three) and an obstruction of justice (Count Twenty-four). The events giving rise to the charges occurred over a period from 1971 through 1978. The Indictment resulted from extensive electronic interceptions, data obtained from informants, and the admissions of certain of the defendants. There are ten defendants named. Not surprisingly defendants have filed extensive pretrial motions challenging the adequacy of the various counts of the Indictment, the propriety of joinder of the counts in the Indictment, seeking severance, dismissal of certain counts as a consequence of prosecutorial misconduct, striking certain material from the Indictment, requesting a bill of particulars, production of documents for inspection, and seeking a continuance.[1] This court has previously ordered evidentiary hearings relating to (1) the Government's compliance with the sealing and minimization requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, (2) the suppression of certain statements by defendant Weisman, and (3) the use of the Government of allegedly immunized testimony of defendant Weisman. The matters requiring evidentiary hearing will be dealt with in a subsequent opinion.

For the reasons set forth below, the motions to dismiss the Indictment, for misjoinder and severance are denied. The motion to strike certain matters from the Indict-ment, for a bill of particulars, document inspecting and for a continuance are granted to the extent set forth below.

## I. COUNT ONE CHARGES AN OFFENSE.

Count One charges defendants Weisman, DePalma and Fusco with violating 18 U.S.C. § 1962 (c);[2] ("RICO"), in that they are alleged to have participated in a pattern of racketeering activity[3] in the conduct of the affairs of the Theatre through the commission of acts of securities fraud and bankruptcy fraud. Section 1962(c) is part of Title IX of the Organized Crime Control Act of 1970 (Public Law No. 91–452).

Title IX, entitled Racketeer Influenced and Corrupt Organizations, proscribes, *inter alia,* "the operation of any enterprise engaged in interstate commerce through a 'pattern' of 'racketeering activity.'" H. R. Rep. No. 1549, 91st Cong., 2nd Sess. *reprinted in* 2 U.S.Code Cong. & Ad.News, pp. 4007, 4010 (1970). Section 1961(1) of Title IX defines racketeering activity to include bankruptcy and securities fraud. A review of the legislative history relating to this statute evinces the concern of Congress in eliminating the influence of organized crime activities in our society. The Senate Report on the Organized Crime Control Act states as follows:

Obviously, the time has come for a frontal attack on the subversion of our economic system by organized criminal activities. That attack must begin, however, with the frank recognition that our present laws are inadequate to remove

---

1. Each defendant has sought the benefit of the motions made by co-defendants. Reference will be made to a particular defendant's motion for the sake of clarity with the understanding that the discussion applies to all motions thus adopted.

2. 18 U.S.C.A. § 1962(c) provides:
 "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

3. 18 U.S.C. § 1961(5) "defines 'pattern of racketeering activity' to require at least two acts of racketeering activity . . ., One act in the pattern must be engaged in after the effective date of the legislation. As amended by the Committee, the two acts necessary to establish the pattern must occur within a period of 10 years, excluding any period the perpetrator was in confinement." H. R. Rep. No. 1549, 91st Cong., 2nd Sess. *reprinted in* 2 U.S.Code Cong. & Ad.News, pp. 4007, 4032 (1970).

criminal influences from legitimate endeavor organizations.

\* \* \* \* \* \*

Title IX recognizes that present efforts to dislodge the forces of organized crime from legitimate fields of endeavor have proven unsuccessful. To remedy this failure, the proposed statute adopts the most direct route open to accomplish the desired objective. Where an organization is acquired or run by defined racketeering methods, then the persons involved can be legally separated from the organization, either by the criminal law approach of fine, imprisonment and forfeiture, or through a civil law approach of equitable relief broad enough to do all that is necessary to free the channels of commerce from all illicit activity.

S. Rep. No. 617, 91st Cong., 1st Sess. 78–79 (1969). This attitude was consistently endorsed in both the House and the Senate during hearings on this bill. It is in this context that the defendants' motions must be viewed.

A. *The Indictment Properly Alleges a Pattern of Racketeering.*

■ Defendant Weisman asserts that in order to establish a violation of 18 U.S.C. § 1962(c) the two acts of racketeering activity necessary to establish a "pattern" must be related. Claiming that the activities with respect to the alleged securities fraud are not related to the activities of the alleged bankruptcy fraud, Weisman seeks dismissal of Count One. The motion is denied.

The statutory definition of pattern of racketeering activity is unambiguous and contains no reference to any requirement of "relatedness." A review of the legislative history establishes that Congress was concerned with proscribing illegal activities of legitimate business, and that the only relation it deemed necessary for the two predicate acts is that they both be in the conduct of the affairs of the same enterprise. 18 U.S.C. § 1962(c) (1970).[4]

Two significant amendments to the definition of pattern of racketeering, prior to the enactment of the statute, lend further support to this view. Prior to these amendments the definition was as follows: "The term pattern of racketeering activity includes at least one act occurring after the effective date of this chapter." S. Rep. No. 617, *supra* at 122. Since "the term 'pattern' indicates that what is intended to be proscribed is not a single isolated act of 'racketeering activity,' but at least two such acts" (*id.*) the statute was amended to read as follows: "The term 'pattern of racketeering activity' means at least two acts, one of which occurred after the effective date of this chapter." *Id.* There was no requirement that the two acts be related to each other. In fact, at that point there was no requirement that the two acts even be related in time. This was the cause of some concern to those who commented on the proposed bill. *See e. g.* 116 Cong. Rec. S855 (daily ed. Jan. 22, 1970) (analysis of American Civil Liberties Union). Such concerns led to the enactment of the ten year limitation in the statute. It was this ten year limitation that provided any requirement of nexus between the two predicate acts. In its final form the statute simply required that the person commit at least two acts of racketeering activity within a ten year period.

Considering the time and effort spent by Congress on this definition, had it wanted to provide for any "relatedness", it had ample opportunity to do so. Instead Congress must have realized that the definition of "pattern of racketeering activity" would necessarily be interpreted in the context of the statute to which it applies (18 U.S.C. § 1962). Thus, the term "pattern", when used in this context, applies to the relationship of the acts to the enterprise, and no more. The definition of "racketeering activity" in the section and the additional definition of "pattern of racketeering activity", taken together, results in the conclu-

---

4. "A 'pattern of racketeering activity' means simply two or more acts of racketeering activity, one of which . . . . must have occurred subsequent to the enactment of the title." 116 Cong. Rec. H35, 295 (daily ed. Oct. 7, 1970) (remarks of Rep. Poff).

sion that the "pattern" definition states a minimum but not necessarily an exclusive definition. A main focus of Title IX was the enterprise,[5] not only the persons committing the acts, and Congress felt that the "pattern" would be supplied by this common factor.[6]

This interpretation was accepted by the court in *United States v. Elliott,* 571 F.2d 880 (5th Cir. 1978). The Fifth Circuit there noted that the Organized Crime Control Act

> does not criminalize either associating with an enterprise or engaging in a pattern of racketeering activity standing alone. The gravamen of the offense described in 18 U.S.C. § 1962(c) is the conduct of an enterprise's affairs through a pattern of racketeering activity. Thus, the Act does require a type of relatedness: the two or more predicate crimes must be related to the affairs of the enterprise but need not otherwise be related to each other.

*Id.* at 899 n.23. This analysis is consistent with the legislative history. *United States v. Parness,* 503 F.2d 430, 438 and 442 (2d Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975) is also apposite in this regard. There, predicate acts of the RICO charge were three separate violations of 18 U.S.C. § 2314, all steps in a scheme to take over a hotel. Although these violations arguably had a greater nexus than merely steps in the common scheme, "there is no indication in *Parness* that the Court of Appeals requires anything more for the establishment of a 'pattern' within the meaning of § 1961(5) than two acts of racketeering . . ." *United States v. Moeller,* 402 F.Supp. 49, 58 n.7 (D.Conn.1975). Indeed, it has been noted in this district, in dictum, that "[t]here is no constitutional principle that would prevent Congress from labeling the commission of two crimes within a specified period of time and in the course of a particular type of enterprise a 'pattern' of activity, whether or not a sequence of two similar acts amounts to a pattern as that term is ordinarily understood." *United States v. Field,* 432 F.Supp. 55, 60–61 (S.D.N.Y.1977).

Defendant Weisman relies heavily on the opinion in *United States v. Stofsky,* 409 F.Supp. 609 (S.D.N.Y.1973) in support of his contention that the two acts themselves must be related in a greater degree than

---

**5.** It was noted during the Congressional hearings that

> "While prosecutions and convictions of leaders of organized crime and their confederates are increasing each year as the Federal Government's organized crime program gains momentum, it is becoming increasingly apparent that such convictions alone, which simply remove the leaders from control of syndicate-owned enterprises but do not attack the vested property interests whose control passes on to other Cosa Nostra leaders, are not adequate to demolish the structure of the surviving organizations which they run. The legislative proposals contained in title IX of this act, entitled 'Racketeer influenced and corrupt organizations,' constitute a carefully structured program which can drastically curtail—and eventually eradicate—the vast expansion of organized crime's economic power which operates outside the rules of fair competition of the American marketplace."

116 Cong. Rec. S607 (daily ed. Jan. 21, 1970) remarks of Sen. Byrd.

**6.** "Subsection (5) defines 'pattern of racketeering activity' to require at least two acts of racketeering activity, as defined above.

> The concept of 'pattern' is essential to the operation of the statute. One isolated 'racketeering activity' was thought insufficient to trigger the remedies provided under the proposed chapter, largely because the net would be too large and the remedies disproportionate to the gravity of the offense. The target of title IX is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.
>
> The concept 'pattern' is thought to provide no due process constitutional barrier to criminal sanctions, as a 'racketeering activity,' defined above, must be an act in itself subject to criminal sanction and any proscribed act in the pattern must violate an independent statute. *See United States v. Nardello,* 393 U.S. 286 [89 S.Ct. 534, 21 L.Ed.2d 487] (1969)."

S. Rep. No. 617, 91st Cong., 1st Sess. 158 (1969). The term "pattern" was thus intended to be read as part of the whole statute and not separately. Continuity (the two alleged frauds) plus relationship (the Theatre) exists here.

just to the affairs of the same enterprise. Although some of the language in *Stofsky* would support this position, the holding in the case does not go this far. In determining the constitutionality of 18 U.S.C. § 1962(c) the court in *Stofsky* stated that "[t]his Court therefore construes the word 'pattern' as including a requirement that the racketeering acts must have been connected with each other by some common scheme, plan or motive so as to constitute a pattern and not simply a series of disconnected acts." *Id.* at 614. But this should not mean that the acts themselves must be interrelated. The common scheme or plan must be supplied in each instance by the enterprise, in the conduct of whose affairs the acts must be committed. Congress, after long analysis and debate, defined the term "pattern". Had Congress intended the definition of "pattern" used in 18 U.S.C. § 3575(e) (also part of the Organized Crime Control Act), which the court in *Stofsky* used to cast light on the § 1961(5) definition of "pattern", it could have specifically provided for such.[7] Instead Congress determined that the "enterprise" would be the common bridge between the two predicate acts and therefore specifically did not provide any other requirement or test of interrelatedness.[8]

It is perhaps reassuring, however, to note that the definition of "pattern" as set forth in 18 U.S.C. § 3575(e) has been met here, for the criminal acts alleged had the same "purposes", "participants", and are interrelated by "distinguishing characteristics and are not isolated events." The characteristics are the use of an apparently legitimate enterprise, the Theatre, as a vehicle to provide benefits to the participants in the pattern as a consequence of concealed criminal acts. If Congress intended this definition to be read into § 1961(5) it should have said so; but even if it had, the Indictment remains sufficient.

In *United States v. White,* 386 F.Supp. 882 (E.D.Wis.1974), cited by defendant Weisman, the court was concerned that absent a showing of a pattern or interrelatedness, 18 U.S.C. § 1962(c) could be used against the isolated acts of an independent criminal; therefore the two acts "must have a greater interrelationship than simply commission by a common perpetrator." *Id.* at 883. This court agrees that more than a common perpetrator is needed. However, the additional element is satisfied by a showing that the predicate acts were both committed in the conduct of the affairs of the same enterprise or business, therefore possessing a distinguishing characteristic, and are not isolated. *See generally* S. Rep. No. 617, 91st Cong., 1st Sess. (1969); 116 Cong. Rec. H35, 196 and H35, 197 (daily ed. Oct. 6, 1970).

Indeed the dictionary definition of pattern, whether in terms of a dress pattern or model, or a pattern of shot, implies separate, discrete elements which are placed together in a whole, a conception consistent with Congress' intent to deal with organized crime.

The Indictment here satisfies the definition of "pattern of racketeering activity"; both frauds are alleged to have been committed in the conduct of the Theatre's affairs and related to the essential functions that the Theatre served in the regular conduct of its affairs. *See United States v. Ladmer,* 429 F.Supp. 1231, 1245 (E.D.N.Y. 1977).

In fact, the alleged frauds are of exactly the type with which Congress was concerned when it enacted the Organized Crime Control Act. As noted by Senator Thurmond during hearings on the bill,

> One of the favorite devices of organized crime is to infiltrate a company, build it

---

7. 18 U.S.C. § 3575(e) defines "pattern of criminal conduct" as follows:

 ". . . Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

8. The court in *Stofsky* seems to acknowledge this when it states:

 "Set forth, then, on the face of the statute is a necessary connection between the person who would commit the enumerated predicate acts and the enterprise, and between the acts and that person's participation in the operations of the enterprise."

up, and then let it go broke so that it can take advantage of certain tax provisions and other devices thus disposing of or protecting a large treasury of illegally obtained dollars. This provision will help in curbing this activity.

116 Cong. Rec. S953 (daily ed. Jan. 23, 1970). Congress recognized that "[i]n business, the mob bleeds a firm of assets, then takes bankruptcy" (176 Cong. Rec. S591 (daily ed. Jan. 21, 1970) (remarks of Sen. McClellan)) and sought to protect the public from such occurrences. It is this type of situation which is alleged in this case.

Furthermore, even if the term "pattern" requires that the predicate acts themselves be interrelated, such exists between the alleged frauds:

(i) Defendants Weisman, Fusco and DePalma allegedly were each involved in both frauds.

(ii) The frauds allegedly were with respect to the same entity.

(iii) The stock fraud allegedly defrauded investors in the sale of the securities. The bankruptcy fraud allegedly defrauded these same investors, who would have been entitled to any remaining assets in the event the Chapter XI reorganization was successful.

(iv) The frauds allegedly had the same common goal of enriching those in control of and related to the Theatre through the use of illegal acts.

(v) Both frauds allegedly were committed well within the statutory requirement of ten years.

(vi) The alleged skimming activities bridge the gap between the securities fraud and the bankruptcy fraud, implying that both were anticipated by those in control of and related to this enterprise. Although the alleged skimming activities here cannot be considered, in themselves, as predicate acts necessary to prove a RICO violation, they still may be considered to prove a nexus between the two frauds. Cf. United

States v. Frumento, 426 F.Supp. 797, 803 (E.D.Pa.1976), aff'd, 563 F.2d 1083 (3d Cir. 1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1258, 55 L.Ed.2d 776 (1978) (jurors could consider acts of bribery as proof of motive, opportunity, intent, plan, knowledge and absence of mistake or accident although such could not be considered as constituting the pattern of racketeering activity). The Indictment sufficiently alleges a pattern of racketeering activity.

B. *The Alleged Predicate Offenses are Sufficient.*

■ Defendant Weisman next asserts that the alleged securities fraud and bankruptcy fraud are insufficient predicate offenses under RICO. With respect to the securities fraud Weisman claims that, although 18 U.S.C. § 1961(1) specifically includes fraud in the sale of securities as a predicate offense, the sale of the securities in this instance, the alleged securities fraud, was not in the conduct of the affairs of the enterprise (18 U.S.C. § 1962(c)), having been committed prior to the formation of the Theatre and therefore not in the conduct of its affairs.

The Indictment alleges that Weisman was involved in the formation of the corporate entity known as the Westchester Premier Theatre [9] and was employed by and associated with such from or about January 1, 1971 (Indictment at ¶¶ 1 and 2). The sale of the securities, in 1973, was "in order to create the Theatre as a going concern" (Indictment at ¶ 3), but not to establish the enterprise; such already existed and pursuant to the securities laws of the United States had to be in existence prior to the offering for sale of any securities of the enterprise. The Indictment relates to the corporate entity, and not merely to the building which housed the Theatre. To conclude otherwise would be to deny reality.

Weisman's claim that the alleged bankruptcy fraud was not part of the day to day

---

9. 18 U.S.C. § 1961(4) defines enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

activities of the enterprise, and therefore not in the conduct of the enterprise's affairs, is also unrealistically technical. The statute in question specifically provides that an offense involving bankruptcy fraud is a predicate offense (18 U.S.C. § 1961(1)(D) (1970)) and the legislative history of the statute evidences Congress' concern with fraudulent bankruptcies. There is nothing in the statute requiring that the racketeering activity be part of the day to day business operation of an enterprise. The statute merely refers to the enterprise's affairs—bankruptcy is such. The affairs of an entity in Chapter XI, as was the enterprise in question here, are in fact controlled by the bankruptcy proceedings. An assertion that these proceedings are not in the conduct of the affairs of the enterprise is frivolous.

C. *The RICO Count and the Other Counts are Not Multiplicious.*

■ Defendants Fusco and DePalma assert that the alleged securities fraud and bankruptcy fraud counts are included in the RICO count and that therefore the Indictment is multiplicious.[10]

Offenses "are the 'same' only when 'the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other.'" *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir. 1961) *quoting Morey v. Commonwealth*, 108 Mass. 433 (1871). Defendant DePalma asserts that proof of the conspiracy charges in Counts Two and Thirteen would establish the RICO count without further proof. As discussed, *supra*, the RICO count requires proof of additional facts—that a pattern of (two or more) racketeering activity existed and that the defendants' alleged racketeering activity was in the conduct of an enterprise's affairs. *See United States v. Smith*, 574 F.2d 308,

310–11 (5th Cir. 1978); *United States v. Hansen*, 422 F.Supp. 430, 433 (E.D.Wis. 1976).

Furthermore, there is nothing in the RICO statute or legislative history to indicate that Congress intended to substitute the RICO charge and penalties for those of the criminal acts constituting the pattern of racketeering activity. *Cf. United States v. Parness, supra*, 503 F.2d at 435 n.5 (violations of 18 U.S.C. § 2314 constituted three separate counts in the Indictment and also constituted the pattern of racketeering activity in violation of 18 U.S.C. § 1962(b)). A single criminal conspiracy or a single criminal act can constitute two or more separate offenses, and Congress may choose to punish each offense without offending the double jeopardy clause. *See generally Gore v. United States*, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); *United States v. Houltin*, 525 F.2d 943, 950–51 (5th Cir. 1976), *vacated on other grounds sub nom. Croucher v. United States*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745 (1977); *see also United States v. Smith, supra*, 574 F.2d at 311. It appears that Congress intended a similar result when it enacted the Organized Crime Control Act. The Statement of Findings and Purpose to the law states as follows:

> It is the purpose of this Act to seek the eradication of organized crime in the United States by *strengthening* the legal tools in the evidence-gathering process, by establishing *new* penal prohibitions, and by providing *enhanced* sanctions and *new* remedies to deal with the unlawful activities of those engaged in organized crime. (Emphasis added.)

Pub.Law 91–452, 84 Stat. 922 (1970).

Further proof of this intent is evident from the language of the statute itself. Section 1961(5) requires that the two predicate acts must occur within ten years, *ex-*

---

10. Count I alleges the RICO violation, which includes the alleged securities fraud and the bankruptcy fraud as predicate offenses. Count II alleges a securities fraud conspiracy. Counts III to XII allege substantive securities fraud charges. Count XIII alleges a bankruptcy fraud conspiracy. Counts XIV to XXIII are substantive bankruptcy fraud charges. Count XXIV alleges obstruction of justice. The securities and bankruptcy fraud conspiracies and the substantive counts with respect thereto are not multiplicious vis-a-vis each other. *See Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

*cluding any period the perpetrator was in confinement.* See H. R. Rep. No. 1549, 91st Cong., 2nd Sess. 56 (1970). This indicates that even though the perpetrator had been convicted of, and served time for, the first predicate act, he could be prosecuted for that act under Title IX. The Indictment is not multiplicious.

## II. PROPRIETY OF JOINDER.

Defendants Weisman,[11] Fusco,[12] Horwitz,[13] Pacella, Gaggi, Marson, Cannatella and Nersesian[14] attack the propriety of their joinder in the Indictment.[15] In essence the defendants contend that joinder is improper vis-a-vis those included in the securities fraud charges or the bankruptcy fraud charges, but not both, and vis-a-vis those charged with obstruction of justice. To be proper the joinder of these defendants must satisfy the requirements of Rule 8(b).[16]

**11.** Weisman asserts that the securities fraud charges and bankruptcy fraud charges were improperly joined; this is based upon his contention that the RICO count should be dismissed. For the reasons set forth above the RICO count will not be dismissed; therefore Weisman's motion for severance of these claims must be denied. Each of the alleged frauds is a predicate offense charged by the Government and necessary to prove a violation of 18 U.S.C. § 1962(c). Weisman's joinder with the other defendants is proper under Fed.R. Crim.P. 8(b) for the reasons discussed in the text.

**12.** Fusco only attacks the joinder of those defendants charged with Count XXIV (obstruction of justice).

**13.** Defendant Horwitz alleges he was improperly joined with those charged with the RICO count and/or with the bankruptcy fraud.

**14.** Defendants Pacella, Gaggi, Marson, Cannatella and Nersesian assert misjoinder in that by allegedly participating in only one of the alleged frauds it is improper to join them with those who allegedly committed the other fraud, those charged with the RICO count and/or those charged with obstruction of justice.

**15.** The Indictment charges the following:

Count I (RICO charge)—DePalma, Weisman and Fusco—the alleged securities fraud and bankruptcy fraud are claimed to be part of the pattern of racketeering activity.

### A. Joinder of those Charged With the RICO Count, the Securities Fraud and the Bankruptcy Fraud is Proper.

The securities and the bankruptcy fraud charges are alleged as predicate offenses of the RICO charge. In this sense, the charges are related to each other, as discussed *supra*, and satisfy the requirements of Rule 8(b) because they arise out of the same series of transactions. *See United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970) *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). The term "transactions" is a word of flexible meaning. *See United States v. Friedman*, 445 F.2d 1076, 1083 (9th Cir.) *cert. denied sub nom. Jacobs v. United States*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971).

The major elements of proof relating to the RICO count will include proof of facts

Count II—DePalma, Weisman, Fusco, Nersesian, Horwitz and Goodman—stock fraud conspiracy.

Counts III through XII—DePalma, Weisman, Fusco, Nersesian, Horwitz and Goodman—substantive counts with respect to the alleged fraudulent sale of securities.

Count XIII—DePalma, Weisman, Fusco, Cannatella, Pacella, Gaggi and Marson—bankruptcy fraud conspiracy.

Count XIV—DePalma, Weisman, Fusco, Cannatella, Pacella and Marson—fraudulent receipt of monies with intent to defeat the bankruptcy law.

Count XV—Gaggi—fraudulent receipt of money with intent to defeat the bankruptcy law.

Counts XVI through XIX—DePalma, Weisman, Fusco and Cannatella—fraudulent concealment of monies from the Bankruptcy Court.

Counts XX through XXIII—DePalma, Weisman, Fusco and Cannatella—submission of false financial statements to the Bankruptcy Court.

Count XXIV—Weisman and Horwitz—Obstruction of Justice.

**16.** Fed.R.Crim.P. 8(b) provides as follows:

"Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

necessary to establish the securities and bankruptcy frauds. All the defendants asserting misjoinder are included in either the securities fraud or the bankruptcy fraud. The indictment alleges that both frauds were committed in the conduct of the Theatre's affairs. The underlying scheme set forth in the Indictment, simply stated, is to use a legitimate enterprise, the Theatre, to profit organized crime and to defraud the public.

This is not a situation in which the securities fraud involved one entity and the bankruptcy fraud another, with the only connection being certain individuals common to both. *See generally Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed.2d 1557 (1945) (the "wheel" rationale). The common nexus alleged is the overall scheme to conduct the affairs of the same legitimate business through illegal means at the expense of the investors and creditors of the enterprise. *See generally United States v. Scott,* 413 F.2d 932, 935 (7th Cir. 1969), *cert. denied,* 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970) ("the test of whether the acts . . . are part of a series of transactions depends on the existence of a common plan"); *cf. Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947) ("chain" conspiracy rationale—each link had knowledge of the overall scheme or plan). As has been noted,

> Two or more conspiracies may, however, be properly joined under Rule 8, if they are sufficiently related. *United States v. Borelli,* 336 F.2d 376, 387 (2 Cir. 1964); *United States v. Varelli,* 407 F.2d 735, 747 (7 Cir. 1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972). Here, although there is no contention that De Lorenzo and Esposito agreed *inter sese* to participate with Pappadio to promote both his and their interests,

hence the need to allege two separate conspiracies, their individual association with Pappadio's solitary on-going scheme, as charged, constitutes a sufficient nexus to warrant joinder under Rule 8. *Cf. United States v. Crockett,* 514 F.2d 64, 70 (5 Cir. 1975).

\* \* \* \* \* \*

The conspiracies are not in any real sense distinct or independent but are part of a common scheme or plan. *United States v. Scott,* 413 F.2d 932, 935 (7 Cir. 1969). *United States v. DeLorenzo,* 416 F.Supp. 570, 572–73 (E.D.N.Y.1976); *see also United States v. Cohen,* 145 F.2d 82, 86–88 (2d Cir.), *cert. denied,* 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1944).[17] The Indictment here alleges the aforementioned common scheme which was jointly and individually executed by the defendants. *See generally United States v. Patterson,* 455 F.2d 264 (9th Cir. 1972).

The organized criminal activity alleged in the Indictment is exactly the type with which Congress was concerned when it passed the Organized Crime Control Act. "[T]hrough RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise." *United States v. Elliott, supra,* 571 F.2d at 902. The alleged activities vis-a-vis a legitimate enterprise were specifically anticipated by Congress; the series of transactions alleged here are sufficiently interrelated and intertwined to justify a joint trial. *See e. g. United States v. Strand,* 517 F.2d 711 (5th Cir.), *cert. denied,* 423 U.S. 998, 96 S.Ct. 428, 46 L.Ed.2d 373 (1975); *United States v. Bova,* 493 F.2d 33 (5th Cir. 1974).

**17.** The Model Penal Code provides that "two or more persons charged with criminal conspiracy may be prosecuted jointly if . . . (ii) the conspiracies alleged, whether they have the same or different parties, are so related that they constitute different aspects of a scheme of organized criminal conduct." Section 5.03(4) at 84, ALI Proposed Official Draft (1962) referred to with approval in *United States v.*

*Borelli,* 336 F.2d 376, 387 (2d Cir. 1964), *cert. denied sub nom., Mogavero v. United States,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). *See also United States v. Lev,* 22 F.R.D. 490 (S.D.N.Y.1958), *aff'd,* 276 F.2d 605 (2d Cir.), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960) (joinder of five separate conspiracies proper when they all flow from the same overall plan or scheme).

It would seem incongruous and inappropriate to construe "a series of transactions" under Rule 8(b) so as to require a closer interrelationship than would obtain under "a pattern of racketeering activity" and thus defeat the Congressional intent. In fact, Congress has designated each alleged act here as being part of a "pattern" of racketeering activity. 18 U.S.C. § 1961(1) (1970). Each alleged fraud is a transaction in such pattern. The fact that a defendant is not charged with both frauds, and therefore not charged with a RICO violation, is not dispositive. If a person was involved in one of the two predicate acts that person may be joined with those charged with the same predicate acts and the other related act.[18] Each defendant need not be named in every count (see United States v. Scott, supra, 413 F.2d at 934–35; United States v. Mandel, 415 F.Supp. 1033, 1047 (D.Md. 1976)), nor is it necessary that all the defendants be involved in each stage or act of the criminal enterprise. See Id.; United States v. Wofford, 562 F.2d 582, 585 (8th Cir. 1977); cf. United States v. Borelli, 336 F.2d 376, 387 (2d Cir. 1964), cert. denied sub nom. Moganero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) (joinder of different defendants charged with participation in separate phases of a single conspiracy proper).

Furthermore, proof of the RICO count would cover the events relating to the securities fraud and the bankruptcy fraud; similarly, proof of the two frauds would be applicable to the RICO count. See e. g. United States v. Gentile, 495 F.2d 626, 630 (5th Cir. 1974); United States v. Spector, 326 F.2d 345, 350 (7th Cir. 1963). The fact that additional facts must be established to prove the RICO count is not sufficient to hold that there has been misjoinder. See United States v. Mandel, 415 F.Supp., supra at 1047. By analogy, "where a substantive count [here, the alleged frauds] is within

the scope of a conspiracy charged [here, the RICO count] then their joinder is proper." United States v. Nettles, 570 F.2d 547, 552 (5th Cir. 1978) citing United States v. Gentile, supra, 495 F.2d at 632; see also Baker v. United States, 393 F.2d 604, 607 (9th Cir.), cert. denied, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106 (1968).

In United States v. Mandel, supra, two of the six defendants were indicted on only one of four counts of racketeering, the indictment relating to certain transactions and legislation concerning a racetrack and certain leases and contracts awarded to various enterprises in which certain defendants were alleged to have had a financial interest. These two defendants, who were named in only the first part of the alleged scheme which involved the racetrack only, asserted misjoinder and sought severance from the other defendants. The court, in denying the motion, found that all the racketeering counts were related to a common scheme or plan to defraud the citizens of the state of Maryland by bribing the Governor to assist legislation relating to the racetrack and to use his power as Governor to channel state business to certain business entities. The court stated:

> It is true that defendants Cory and Kovens are named in only the first part of the scheme, that involving Marlboro [the racetrack], and not the second part involving Security Investment and Ray's Point. However, it is not necessary that each defendant be named in every part of the scheme as long as he plays a role in some part of that scheme. The twenty mail fraud counts and four racketeering counts contained in the instant indictment constitute offenses, in the Court's opinion, that arise out of "the same series of acts or transactions." The important point to be proven at trial is that each of

---

18. In United States v. Parness, supra, 503 F.2d at 430, only one of the two defendants was charged with the three RICO counts under § 1962(b) since only he had allegedly actually acquired an interest in the three separate enterprises. Although joinder was not an issue addressed by the Second Circuit, this court takes some comfort in that trial was joint even though one defendant was not charged with any RICO violation, but was charged with only the crimes alleged to have constituted the individual acts constituting the pattern of racketeering.

the defendants participated in a scheme to defraud. In that circumstance, whether or not each was personally involved in every aspect of the scheme is irrelevant. The Court holds, therefore, that there has been no misjoinder of defendants under Rule 8(b).
*Id.* at 1047.

In *United States v. Campanale,* 518 F.2d 352 (9th Cir.), *cert. denied sub nom. Grancich v. United States,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1975), five of the nine defendants were charged with only one of the two RICO conspiracies (18 U.S.C. § 1962(d)) which were alleged. Two of these five defendants were charged with substantive violations in only two of the remaining six counts and another two defendants in only one. A joint trial was found proper since both racketeering conspiracies were related; the criminal acts with which the defendants were charged arose out of the same underlying activity. *Id.* at 359.

Both *Mandel* and *Campanale* apply here. The RICO count in the instant Indictment alleges a sufficient nexus or common scheme between the two alleged conspiracies and substantive counts to satisfy the joinder requirements of Rule 8(b).

In *United States v. Grasso,* 55 F.R.D. 288 (E.D.Pa.1972), cited by defendants, the Government attempted to join the defendants on the basis that they all worked out of the same real estate office and that they were charged with the same or similar violations of law. Although this may have been sufficient to satisfy the requirements of Rule 8(a), under Rule 8(b) the court determined that joinder was improper. However, there was no overall common scheme or conspiracy alleged; the acts of the defendants were separate and unconnected.

Similarly, *United States v. Marionneaux,* 514 F.2d 1244 (5th Cir. 1975), *cert. denied,*

434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189, does not support the defendants' position. In *Marionneaux* the Government did not allege an overall conspiracy to obstruct justice, but alleged two separate conspiracies. Although there was a common goal (to obstruct the trial of one Edward Partin), there was· no common scheme or plan among the two conspiracies. In the case *sub judice* the Indictment asserts that a common scheme exists—to use a legitimate business as a front for several illegitimate activities.[19] This is not the situation that existed in *United States v. Bertolotti,* 529 F.2d 149, 155 (2d Cir. 1975), where only one of the four major transactions resembled the orthodox business operation found to exist in narcotics conspiracies. Here, the illegitimate activities alleged were exactly the type Congress was seeking to prevent when it enacted the Organized Crime Control Act. Joinder is proper.

**B.** *Joinder of Those Charged with Obstruction of Justice.*

■ Count XXIV alleges that defendants Weisman and Horwitz endeavored to obstruct the Government's investigation of the securities fraud referred to in Counts I through XII of the Indictment. The Rule 8(b) standard equally applies to the joinder of these two defendants vis-a-vis this count.

Count XXIV involves a grand jury investigation concerning an illegal enterprise which is the predicate of previous counts in the Indictment. It arises out of the same series of transactions as the other counts in the Indictment in that the obstruction of justice is allegedly directed at concealing the existence of certain criminal acts with respect to these counts. In *United States v. Castellano,* 416 F.Supp. 125, 128 (E.D.N.Y. 1975), in facts similar to those alleged here, the court refused to sever a defendant charged with obstruction of justice by attempting to influence a witness before the grand jury, since such obstruction involved

---

**19.** The fact that all the defendants are not charged with the RICO count is immaterial. In order to do so the Government would have to prove that each either committed two predicate offenses (§ 1962(c)) or conspired to do so (§ 1962(d)). As long as the Indictment alleges that all the defendants were in some way involved in a common scheme or plan with respect to the enterprise, joinder is proper.

grand jury testimony concerning the illegal enterprise which formed the predicate of two counts of the Indictment alleging violation of 18 U.S.C. § 1962(c). This holding, although pursuant to a Rule 14 motion to sever, is equally applicable to a Rule 8(b) motion.[20]

It is not necessary that Count XXIV be pleaded as one of the predicate acts of the RICO count or as one of the overt acts of either conspiracy to be properly joined. *See United States v. Hilliard, supra,* 436 F.Supp. 66. In *United States v. Crockett,* 514 F.2d 64, 70 (5th Cir. 1975), joinder was held proper where the defendant was charged with conspiracy to obstruct the laws against gambling with which his co-defendants were charged with violating. The alleged obstruction here was to conceal certain of the transactions referred to in Counts I through XII of the Indictment; therefore a sufficient connection exists for joinder. Furthermore, the proof of conspiracy, fraud and racketeering is admissible to show motive and wilfulness of Weisman and Horwitz with respect to the obstruction of justice charge. *See Id., United States v. Sweig,* 441 F.2d 114, 118 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

## III. GOODMAN'S MOTION TO DISMISS THE INDICTMENT.

Defendant Goodman has moved this court for dismissal of the indictment against him or, in the alternative to suppress his grand jury testimony, asserting that he was misled when he was told by the Government, in response to his attorney's inquiry, that he was not a "target"[21] prior to his testimony before the grand jury.[22] Goodman was thereafter indicted on a conspiracy count and one substantive count

arising out of the alleged purchase by Scottish General Nominees Ltd. of 15,000 shares of stock in the Theatre in return for a promissory note purportedly signed by Goodman, among others, as a guarantee against loss in the event of a sale by Scottish General. Goodman alleges he was therefore the victim of prosecutorial misconduct violating his constitutional rights and is entitled to dismissal of the Indictment.

It is undisputed that at the time of Goodman's grand jury testimony the Government had the promissory note in its possession and that Goodman was advised that he was not a target of the investigation. The Assistant United States Attorney has testified that his advice at the time it was given in good faith and was accurate, the significance of the note was not apparent to him and the ultimate decision to indict Goodman rested on the entire investigation, not merely the note. As substantiation of this recollection it is pointed out by the Government that another guarantor of the note was not indicted.

Any claim that under these circumstances, Goodman's due process constitutional rights were violated by the prosecution is not supported by the authorities. *See United States v. Ruffin,* 575 F.2d 346, 351 and n.8 (2d Cir. 1978); *see generally United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1975). Whether or not Goodman was in fact a target, and the state of his knowledge of his status, do not raise constitutional implications.

It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury, and witnesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are. Because target

---

**20.** In fact, the court would not be able to reach Rule 14 unless joinder was first proper pursuant to Rule 8(b).

**21.** A "target" is a person as to whom the prosecutor or the grand jury has substantial evidence linking him to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. Guidelines of the United States Department of Justice, Issued Dec. 16, 1977.

**22.** In this instance it was not significant that Goodman was affirmatively told he was not a target versus not being told anything at all. Goodman, who was represented by able counsel fully familiar with the practices of the United States Attorney's Office, would have had the same understanding in either event—that he was not a target.

witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential defendant warnings add nothing of value to protection of Fifth Amendment rights.

*United States v. Washington,* 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1976). Even if Goodman was a target at the time of his grand jury questioning he was not pressured, duped or tricked into testifying. Goodman knew that the grand jury was investigating various dealings and transactions of and relating to the Theatre, he knew the Government had knowledge that he was in some way connected to the Theatre, he had an attorney present outside the grand jury room and he was given his *Miranda* warnings, including being advised of his Fifth Amendment right to refuse to answer incriminating questions.

The language of the Supreme Court in *United States v. Washington, supra,* is controlling here:

> After being sworn, respondent was explicitly advised that he had a right to remain silent and that any statements he did make could be used to convict him of crime. It is inconceivable that such a warning would fail to alert him to his right to refuse to answer any question which might incriminate him. This advice also eliminated any possible compulsion to self-incrimination which might otherwise exist. To suggest otherwise is to ignore the record and reality. Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled. Moreover, any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminatory aspects is completely removed by the warnings given here. Even in the presumed psychologically coercive atmosphere of police custodial interrogation, *Miranda* does not

require that any additional warnings be given simply because the suspect is a potential defendant; indeed, such suspects are potential defendants more often than not. *United States v. Binder,* 453 F.2d 805, 810 (C.A.2 1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2458, 32 L.Ed.2d 805 (1972).

*Id.* at 188, 97 S.Ct. at 1819. It could hardly be said that Goodman did not have fair warning of his predicament. *United States v. Ruffin, supra* at 353. It may have been more appropriate for the United States Attorney's office not to tell Goodman he was not a target: however, in light of *Washington* and *Ruffin,* and the presence of counsel, the warnings given Goodman and his knowledge of the subject of the investigation, this court will not dismiss the Indictment or suppress his testimony. *United States v. Crocker,* 568 F.2d 1049, 1055 (3d Cir. 1977); *United States v. Jacobs,* 547 F.2d 772 (2d Cir. 1976), *cert. denied as improvidently granted,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978).

Goodman asserts that irrespective of his due process rights, *United States v. Jacobs, supra,* imposes a type of fairness standard requiring dismissal of the Indictment or suppression of the testimony. However, *Jacobs* is not applicable to the situation before this court. There, the Government conceded that the defendant was in fact a "putative defendant" at the time of her grand jury testimony. The court noted that the practice of the United States Attorney in the district was to advise a witness of target status when such is known to be the case; this was not done by the Strike Force. The decision simply sought "to impose a one-time sanction to encourage uniformity of practice . . . in the same district." *Id.* at 773. It was "not intended to mandate any specific procedure, but to serve as an *ad hoc* sanction . . . to enforce 'consistent performance' one way or another." *Id.* at 778. *See United States v. Hilliard, supra,* 436 F.Supp. at 66.[23] In declining

---

**23.** The Second Circuit based its opinion "only on our supervisory power, exercised in a circumscribed manner involving the Strike Force, and in circumstances where under the sanction imposed, a guilty person, in any event, would not be likely to escape conviction because of our ruling."

to suppress grand jury testimony where the defendant was not told of his target status, Judge Conner set forth the "avowed 'didactic purpose' of the Second Circuit's rulings in *Jacobs*, i. e., 'to make the practice of the [Strike] Force conform to that of the United States Attorney in the same district'." *United States v. Hilliard, supra*, 436 F.Supp. at 70. *Jacobs' ad hoc* determination does not support Goodman's position. This court recognizes that Government misconduct may rise to such a level that an indictment need be dismissed or the testimony suppressed. *United States v. Ruffin, supra*, 575 F.2d at 353 n.10 *citing United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972). This is not such a situation.[24]

Subsequent to Goodman's initial motion new counsel was retained, who, in a supplemental brief submitted to this court, for the first time requested an evidentiary hearing on the issue of whether the Government intentionally misled Goodman. However, Goodman has cited no authority that under such circumstances he would be entitled to a dismissal of the Indictment or suppression of his testimony; in fact, to allow such a result would be contrary to the holding in *United States v. Crocker, supra* and *dictum* in *United States v. Ruffin, supra*. Furthermore, Goodman has adduced no facts nor has he made any prima facie showing to challenge the Assistant United States Attorney's affidavit or to indicate deliberate and intentional misconduct. To allow a defendant to inquire into such allegations based upon mere speculation would be inexpedient and unjustified. The limit of judicial inquiry into this claim of deprivation of previously unarticulated constitutional

rights has been reached. The motion for an evidentiary hearing on this issue is also denied.

## IV. COUNT XXIV WILL NOT BE DISMISSED.

Defendants Weisman and Horwitz seek dismissal of Count XXIV of the Indictment. Horwitz asserts a violation of his Fourth Amendment rights; both Weisman and Horwitz claim that their Sixth Amendment rights were violated and that any criminal activity to obstruct justice resulted from entrapment by the Government.

■ Horwitz's claim that use of informant Brodsky to record his conversations subsequent to his grand jury testimony violated his Fourth Amendment rights is without merit. The conversations were with a person who was cooperating with the Government; Horwitz had no Fourth Amendment protection that a person with whom he was conversing would not then or later reveal the conversation to legal authorities. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1970); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Horwitz was not under indictment at the time (*Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)); there is no persuasive authority for the proposition that his testimony before the grand jury, and his invocation of his Fifth Amendment privilege, with counsel present, affords him a constitutionally protected expectation of privacy from that time forward.

---

*United States v. Jacobs, supra* at 775. In *Jacobs* the grand jury testimony was suppressed and the perjury count arising therefrom was dismissed; however, the threat to kidnap or injure charge, upon which defendant had been called to testify, was not affected. Here Goodman would have this court effectively dismiss the charges against him; such was not the intention of the court in *Jacobs*. *See generally, United States v. Ruffin, supra*, 575 F.2d at 353, n.10.

**24.** At oral argument on this motion counsel for Goodman stated:

"It is a question of degree, I believe, your Honor. If Mr. Akerman were to stand up and say that he intended to deceive the defendant, I don't believe we would have to discuss it at all. Obviously he is not saying that and he is not about to say that and I am not charging him with that. *I would have no evidence that he made an attempt to deceive here.*"

(Transcript July 26, 1978 at 223)

■ The alleged violation of the Sixth Amendment rights of Horwitz and Weisman is equally without authority. Reliance on *Massiah v. United States, supra,* is misplaced, for *Massiah* was concerned with post-indictment statements obtained without presence of counsel. "[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1971). No case has come to this court's attention which has held that a defendant's testimony before a grand jury constitutes such proceedings. The arrest of Weisman on another unrelated charge does not alter the situation, that charge having been dismissed prior to any of the conversations here in question. *See United States v. Hinton,* 543 F.2d 1002, 1014–15 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *United States v. Missler,* 414 F.2d 1293, 1302–03 (4th Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *United States v. Edwards,* 366 F.2d 853, 872–73 (2d Cir. 1966), *cert. denied,* 386 U.S. 919, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967). The motions premised upon alleged violations of the Fourth and Sixth Amendment rights of Horwitz and Weisman are denied.

■ Defendants' claim that this court should dismiss Count XXIV of the Indictment due to the conduct of the Government in obtaining the evidence against them (an entrapment defense) is untimely. The law of entrapment was set forth by the Supreme Court in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 511 (1932):

> It is well settled that the fact that officers or employees of the Government merely afford opportunities or 'facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citations omitted.] The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design. * * *. A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.

*Id.* at 441–42, 53 S.Ct. at 212–13. Therefore, where the defense of entrapment is asserted, two questions of fact arise:

> (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it.

*United States v. Viviano,* 437 F.2d 295, 298 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971). These are usually questions for the jury. *See e. g. United States v. Quinn,* 543 F.2d 640, 647 (8th Cir. 1976).

■ However, Weisman and Horwitz assert that apart from any predisposition by them to commit the crime charged in Count XXIV, the Government's participation in the crime was so outrageous as to deprive them of their right to counsel and constituted such prosecutorial impropriety as to deprive them of the due process of law and that therefore, as a matter of law, they were entrapped. The Supreme Court has stated that some day the situation may be presented "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1972); *see also Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975) (concurring and dissenting opinions). This day has not arrived for Weisman and Horwitz. Although the Government sought by use of its informer to confirm its view of defendants' conduct and to encourage them

to seek to obstruct justice, this court cannot conclude, at this stage of the proceedings, that it was so outrageous as to deny the defendants the due process of law.

For the purposes of this motion this court must review the facts in the light most favorable to the Government.[25] It is alleged that Horwitz and Weisman had been involved in a plan to arrange for a certain corporation (the "Corporation") to purchase 20,000 shares of the Theatre's stock by a $50,000 cash bribe to two officers of the Corporation. After the sale of the stock the Theatre was reimbursed by the Corporation, to be covered in part by an invoice of $30,000 to the law firm of informant Brodsky for legal services which had not been performed. During the grand jury investigation into this and related matters, Weisman told Brodsky that he would arrange for Horwitz to contact him so that they could get their stories straight. On two occasions Horwitz and Brodsky discussed the plan; at the conclusion of the second meeting Brodsky promised Horwitz he would keep him informed of what he was doing with respect to the grand jury investigation. Brodsky thereafter agreed to cooperate with the Government, wore a body recorder, and agreed to a wiretap of his telephone.

Based upon the information supplied to the Government by Brodsky, the Government had reason to believe that Horwitz and Weisman were counselling each other in an attempt to prevent the grand jury from learning the facts with respect to the payment by the Corporation. As part of his cooperation, Brodsky fabricated a story that his former law partner had been called to testify before the grand jury and that he needed some information, more specifically some names of employees of the Corporation, so that his former partner could answer questions by the grand jury as to the nature of the alleged legal work and the officer of the Corporation involved. It is in this presumed context that the assertions of Weisman and Horwitz must be viewed.

The Government did not implant the criminal design in the minds of Horwitz and Weisman; it merely conceived of a plan whereby it could obtain further evidence of such scheme. This was not a trap for the unwary innocent, but rather for the unwary. See Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). The use of deceit to obtain evidence of the crime is proper, "for there are circumstances when the use of deceit is the only practicable law enforcement technique available." United States v. Russell, supra 411 U.S. at 436, 93 S.Ct. at 1645; see also Osborn v. United States, 385 U.S. 323, 326, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). Furthermore, the technique used by the Government did not involve activities that resulted in injury to the rights of innocent citizens, a concern expressed by Judge Friendly in United States v. Archer, 486 F.2d 670, 677 (2d Cir. 1973).

A review of the transcripts of the recorded conversations indicates that Weisman confirmed his participation in the plan without cajoling, enticement or duress by Brodsky. Weisman's allegation to the contrary is rejected. See United States v. Viviano, supra, 437 F.2d at 299.

Although defendant Horwitz presents a more difficult factual setting, a review of all the transcripts of the recorded conversations between Brodsky and Horwitz indicates that although Horwitz did not supply Brodsky with names until their second meeting (and after six telephone conversations) he did not resist any suggestions that the grand jury investigation be impeded and the facts, alleged to be true, be concealed. In fact, Horwitz appears to support the "story" that was already developed— that the legal fees were for some work with respect to a cable television deal, possibly some acquisitions, that Brodsky had lost his file as to any work done, that it was a legitimate fee since it had been recorded on Brodsky's tax return and that his recollec-

---

25. Any discussion of facts in the text is based upon this presumption. It should not be presumed, for any other purpose, that this court accepts the representations of the Government as to any alleged criminal activities or predisposition.

tion of five years ago was poor. It appears that his refusal to give names to Brodsky connotes not so much a desire not to do so, as his inability to get any names from the Corporation. The repeated attempts by Brodsky to get him to give names are not so outrageous as to be a denial of due process. They are properly a consideration for the jury in determining the element of propensity. *See United States v. Viviano, supra,* 437 F.2d at 299 n.2.

Defendant Horwitz has also moved to dismiss Count XXIV of the Indictment on the basis of two alleged irregularities before the grand jury. Horwitz asserts the Indictment should be dismissed for the failure of the Assistant United States Attorney to give appropriate instructions to the grand jury as to the law concerning the affirmative defense of entrapment and for the alleged failure to play seven of the eight tape recorded conversations between Brodsky and Horwitz. Horwitz has cited no direct authority for this proposition and, indeed, the rule appears to the contrary. An indictment valid on its face "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). *See also United States v. Guillette,* 547 F.2d 743, 752 (2d Cir. 1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102.

Horwitz claims that the grand jury was deprived of its ability to " 'acting independently of either prosecuting attorney or judge,' " and a denial of the constitutional guarantee that the grand jury be a "protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1972) (citation omitted). These tapes and an instruction on the relevant law, according to Horwitz, would have established his defense of entrapment.

■ Normally, the prosecutor is under no duty to inform the grand jury of facts which would form the basis of a defense at trial. 8 *Moore's Federal Practice* ¶ 6.03[2]

at 6–40 (1977). *See United States v. Ruyle,* 524 F.2d 1133, 1136 (6th Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976) (defendant not entitled to challenge indictment "on the ground that information which he considered favorable to his defense was not presented to the grand jury"). The grand jury's duty is to hear the State's evidence in order to decide whether the evidence is sufficient to warrant putting a person on trial for a crime. *Cobbs v. Robinson,* 528 F.2d 1331, 1338 (2d Cir. 1975).

■ The authorities relied upon by Horwitz do not alter the general proposition just set forth. In both *United States v. Provenzano,* 440 F.Supp. 561, 566 (S.D.N.Y. 1977) and *United States v. Phillips Petroleum Company,* 435 F.Supp. 610, 621 (N.D. Okl.1977), the courts dismissed indictments because of the failure of the prosecutor to present evidence to the grand jury which would directly contradict the testimony of key witnesses upon whom the indictments were based. In *United States v. Estepa, supra,* 471 F.2d at 1132, the court dismissed an indictment because the prosecuting attorney failed to advise the grand jury that key testimony establishing probable cause of a criminal act was based entirely on hearsay. Under these holdings evidence, known to the prosecutor, which tends to establish that the alleged criminal act did not occur must be disclosed. After noting the absence of any legal obligation to present exculpatory evidence to the grand jury under *United States v. Y. Hata Co.,* 535 F.2d 508, 512 (9th Cir. 1976), *cert. denied,* 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92; *Loraine v. United States,* 396 F.2d 335, 339 (9th Cir.), *cert. denied,* 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968), the Department of Justice guidelines require a prosecutor with personal knowledge of "substantial evidence which directly negates the guilt of a subject of the investigation" to present such evidence. Guidelines of the United States Department of Justice, issued December 16, 1977. For the reasons already set forth, *supra,* a review of the tapes in question by this court establishes that

the affirmative defense of entrapment does not directly negate the charge against Horwitz, nor do the tapes alone as the record now stands constitute substantial evidence to that effect. Moreover, no authorities have been presented to this court which require production and review of the grand jury evidence and instructions relating to the subjective disposition of Horwitz to commit a crime. The motion to seek such a result is denied. *United States v. DeMarco*, 401 F.Supp. 505, 513 (C.D.Cal.1975), aff'd., 550 F.2d 1224 (9th Cir. 1977), relied upon by Horwitz, fails to persuade this court that advice and evidence relating to a defendant's affirmative defense must be submitted to a grand jury, even though dismissal of the indictment as a malicious prosecution brought for improper purposes appears justifiable.

## V. MOTION TO STRIKE SURPLUSAGE IN THE INDICTMENT.

Defendants Pacella, Marson, Weisman and DePalma move, pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, to strike certain language in the Indictment as surplusage. Specifically, defendants Pacella and Weisman move to strike the use of the words "skimming" and "looting" from paragraphs 4, 10, 11 and 12 of Count I; defendant Weisman also moves to strike "Among the means" from paragraph 6 of Count I and "and other activities" from paragraph 11; defendant DePalma moves to strike any reference to an "unindicted co-conspirator", and defendant Marson moves to strike any reference to himself as a "confederate" in Count I of the Indictment. These claims are separately discussed below.

Defendants Pacella and Weisman allege that the use of the terms "skimming" and "looting" as they refer to the bankruptcy fraud charge in Count I will unnecessarily prejudice the defendants by the very connotation of guilt implicit in the words themselves. Defendant Weisman further alleges that the acts of skimming and looting, even if committed, do not constitute a federal crime, are not elements of the crime charged, and may not be used to create a pattern between predicate RICO offenses.

■ A motion to strike surplusage will be granted only where it is clear that the allegations are not relevant to the crime, charged, and are inflammatory and prejudicial. *United States v. Pilnick*, 267 F.Supp. 791 (S.D.N.Y.1967); *United States v. Chas. Pfizer & Co.*, 217 F.Supp. 199, 201 (S.D.N.Y. 1963); *see* Notes of the Advisory Committee, 18 U.S.C.A., Rule 7 (1970). This is a rather exacting standard, it is noted, and only rarely has alleged surplusage been stricken. 1 Wright, *Federal Practice and Procedure* § 127 at 278, n.15 (1969).

■ Assuming that all of defendants Weisman's and Pacella's allegations are true, prejudice may arise from the inclusion in the Indictment of the words "skimming" and "looting". However, if evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken.[26] *United States v. Chas. Pfizer & Co.*, *supra*. The Government may broadly allege that which it intends to prove and that which, under applicable principles of law it may prove. The language of the Indictment cannot be more prejudicial than the evidence offered to sustain it. *United States v. Chas. Pfizer & Co.*, *supra*; *United States v. A. B. Dick & Co.*, 7 F.R.D. 437, 441 (N.D.Ohio 1947). If the allegation is of matters by which the Government hopes to establish the charge, then such allegations can scarcely be called "surplusage". 1 Wright, *Federal Practice and Procedure* § 127 at 278 (1969). The relevance of the words "skimming" and "looting" to the crime charged is thus determinative of these motions.

Count I of the Indictment charges the defendants with participating in the affairs

---

**26.** Although one authority has condemned as prejudicial the practice of inserting "unnecessary allegations for 'color' or 'background' hoping that these will stimulate the interest of the jurors," *see* 1 Wright, *Federal Practice and Procedure* § 127 at 277 (1969), this District has held that the determinative question is not the extent of the potential prejudice, but rather the relevance of the allegation to the crime charged in the Indictment. *United States v. Chas. Pfizer & Co.*, 217 F.Supp. 199, 201 (S.D.N.Y.1963).

of the Theatre through a pattern of racketeering activity. Indictment at paragraphs 1–12; see 18 U.S.C.A. § 1962 (Cum.Supp. 1978). As predicate offenses to the racketeering charge, Count I charges the defendants with fraudulently selling the securities of the Theatre and with scheming to defraud the Theatre's creditors (bankruptcy fraud). As to the bankruptcy fraud, Count I alleges that the defendants were "skimming" and "looting" the receipts and proceeds of the Theatre at the expense of the legitimate stockholders and creditors.

Section 152 of Title 18 of the United States Code provides that it is unlawful for any individual or agent or officer of any corporation to knowingly and fraudulently transfer or conceal any of his or the corporation's property in contemplation of a bankruptcy proceeding, or with intent to defeat the bankruptcy law. See In re Halpern, 262 F.Supp. 271 (E.D.N.Y.1967) aff'd. 387 F.2d 312 (2nd Cir. 1968). United States v. Greenhill, 305 F.2d 289 (2d Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962). Section 152 further provides that it is unlawful for anyone to conceal from the creditors of a corporation any property belonging to the estate of a bankrupt. See United States v. Piccini, 412 F.2d 591 (2d Cir.), cert. denied, 397 U.S. 917, 90 S.Ct. 923, 25 L.Ed.2d 98 (1969). The allegations of skimming and looting, therefore, will be relevant to the crime charged in Count I and admissible as proof of bankruptcy fraud.

Paragraphs 4, 10, 11 and 12 allege that certain defendants skimmed the proceeds of the Theatre and converted a portion of those looted receipts and proceeds to their own use.[27] Because Section 152 makes it unlawful for any individual or officer of the Theatre to transfer or conceal funds from the creditors of the Theatre, the allegation of skimming and looting by certain defendants thus becomes part of the Government's proof as to the crime of bankruptcy fraud as charged in the Indictment. Further, the allegations of skimming and looting in contemplation of the bankruptcy proceeding are admissible to prove the motive, intent, plan, opportunity, preparation, or knowledge of the defendants in scheming to defraud the creditors of the Theatre once that Theatre was involved in the Chapter XI proceeding. See Fed.R.Evid. 404(b). Paragraphs 4, 10, 11 and 12 are incorporated by reference in Count XIII of the Indictment, charging the defendants with conspiring to commit bankruptcy fraud. Here too, the allegations of skimming and looting are both admissible and relevant in that they may be used to prove the nature and objectives of the conspiracy. See United States v. Morton, 483 F.2d 573, 576 (8th Cir. 1973). The allegations that the defendants skimmed and looted the proceeds of the Theatre can thus be viewed as an element of the Government's proof at trial.

The relevance of the aforementioned allegations having thus been established, the defendants' motions to strike the terms "skimming" and "looting" are denied.

In addition to seeking to strike any reference to "skimming" and "looting", defendant Weisman seeks to have the words "Among the means" stricken from paragraph 6, and "and other activities" stricken from paragraph 11 of Count I. The determinative question here is whether these two phrases are contained in the "means" paragraph or the "charging" paragraph of the Indictment.

█ A charging paragraph in the Indictment sets forth the gravamen of the offense as charged by the grand jury. United States v. Mayo, 230 F.Supp. 85, 86 (S.D.N.Y.1964). As such, a charging paragraph must delineate the matter upon which the grand jury based its accusations against the defendants. United States v. Pope, 189 F.Supp. 12, 25 (S.D.N.Y.1960). Consequently, a broad allegation such as "and other activities" when contained therein adds nothing to the charges, gives the defendant no further information with respect to them, and creates the danger

---

**27.** Paragraph 10 of the Indictment alleges that the defendants skimmed and looted the proceeds of the Theatre soon after it opened in 1975. Paragraph 11 alleges that a petition for Chapter XI bankruptcy proceeding was filed in 1976 as a result of this skimming. And paragraph 12 alleges a continuing pattern of skimming and looting thereafter.

that the prosecutor at trial may impermissibly enlarge the charges contained in the Indictment returned by the grand jury. *United States v. Pope, supra*, 189 F.Supp. at 25–26. The means paragraph, however, goes to the matter of proof to sustain the charges. *United States v. Mayo, supra*. Accordingly, the phrase "and other activities" or "among the means" when contained therein can be equated to allegations of overt acts in a conspiracy charge where the Government is not required to set forth all the acts relied upon to effectuate the conspiracy. *United States v. Mayo, supra*.

■ In the instant case, paragraph 6 is the means paragraph that introduces the RICO charge.[28] Consequently, defendant's motion to strike the phrase "among the means" is denied. The eleventh paragraph, however, charges the defendants with having caused the bankruptcy of the Theatre by skimming its proceeds and receipts. Thus paragraph 11 goes to the gravamen of the offense of bankruptcy fraud as charged in the Indictment. *See* 18 U.S.C. § 152 (1970). Consequently, the phrase "and other activities" must be stricken and to that extent defendant's motion is granted. *See United States v. Pope, supra*, 189 F.Supp. at 25–26.

■ Defendant DePalma seeks to have this court expunge any reference to an unindicted co-conspirator in Counts I and XIII of the Indictment. Although this court has the power to expunge unauthorized grand jury activity, *see Branzburg v. Hayes*, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), it is unnecessary to exercise this power with regard to the instant motion.

Defendant DePalma relies upon the Fifth Circuit case of *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975), for the proposition that a grand jury lacks the authority to accuse persons of a crime without naming them as defendants: that is, to name them as unindicted co-conspirators. In *Briggs*, after a lengthy review of the powers, purposes, and functions of a grand jury, the court held that a grand jury is without

authority to *name a specific individual* as an unindicted co-conspirator:

> [W]e find no substantial authority permitting a federal grand jury to issue a report accusing named private persons of criminal conduct. We perceive no persuasive reason why the federal grand jury should be permitted to do by indictment what it could not do within the historical outer limits of a grand jury report.

*United States v. Briggs, supra*, 514 F.2d at 802 (footnote omitted); *see Ostrer v. Aronwald*, 434 F.Supp. 396, 403 (S.D.N.Y.1977). The court reached its conclusion based upon the principle that "'a man should not be subject to a quasi-official accusation of misconduct which he cannot answer in an authoritative forum'" because he has not been indicted as a defendant. *Briggs, supra*, quoting from *Application of United Electrical Radio and Machine Workers*, 111 F.Supp. 858, 867–68 (S.D.N.Y.1953) (analogizing an indictment to a grand jury report). *Briggs* sought to protect an individual from the "'punishment of public reprimand'". *Id.* at 803.

Whereas *Briggs* involved three individuals who were specifically referred to as unindicted co-conspirators, the instant case involves an Indictment that refers to an unindicted co-conspirator without naming any specific individual: "others known and unknown by the Grand Jury", Indictment at paragraph 13; "co-conspirators", Indictment at paragraph 14. Nowhere in the Indictment is reference made to, e. g., "the unindicted co-conspirator Smith." As the *Briggs* court noted, "we know of no reason why, if the indictment wishes to center upon a specific person but not name him as a defendant, he cannot be described as 'John Doe'" or as "an 'other person'". *Briggs, supra* at 805. Although it is true that an unindicted co-conspirator referred to as an "other person" may be uncovered at trial or in a bill of particulars, such unmasking will not breach the interests which *Briggs* was so concerned with protecting:

**28.** Paragraph 6 states: "Among the means by which the defendants and their confederates would and did engage in, conduct and partici-

pate in the affairs of the Theatre through a pattern of racketeering were the following:".

An unindicted conspirator anonymously designated as an "other person" or as "John Doe" may be unmasked in a bill of particulars or at trial. The bill of particulars is, however, the statement of the prosecutor and does not carry the imprimatur of credibility that official grand jury action does. At least arguably its public impact may be tempered by protective orders entered by the court. When a witness testifies at trial he does so as a private individual and makes no formal adjudication regarding criminality. An indictment, the formal act of an impartial, formally convened quasi-judicial body of historical status and power, carries more impact on the reputation of its subject than does trial testimony. In any event, it must be recognized in the process of balancing private injury and governmental interests that wholly different, and valid, governmental interests apply to naming the private citizen in a bill of particulars or in trial testimony than apply to identifying him in the indictment as an unindicted conspirator. 514 F.2d at 805. Therefore, because a reference to an anonymous unindicted co-conspirator does not exceed the grand jury's authority, and because such reference is found in the instant case, defendant DePalma's motion to expunge must be denied.

█ Finally, defendant Marson moves this court to expunge from the Indictment any reference to himself as a confederate in paragraph 12 of Count I.[29] Paragraph 12 of Count I charges defendants DePalma, Weisman, Fusco, "and their confederates named in Count Thirteen" with defrauding the legitimate creditors of the Theatre. Count Thirteen charges the defendants DePalma, Weisman, Fusco, Cannatella, Pacella and Marson with conspiring to defraud the legitimate creditors of the Theatre in violation of 18 U.S.C. § 152 (1970). Consequently, paragraph 12 incorporates defendants Cannatella, Pacella and Marson by refer-

ence into Count XIII, thus making those defendants specifically named unindicted confederates in Count I.

As noted above, a federal grand jury exceeds its authorized power when it seeks to name specific individuals as unindicted confederates or co-conspirators. *Briggs, supra* at 802. By specifically naming these defendants by incorporation into Count I without indicting them as defendants in that Count, the grand jury accuses these "persons of crime while affording them no forum in which to vindicate themselves." *Id.* See *Application of United Electrical Radio and Machine Workers, supra.* Consequently, defendant Marson's motion to expunge any reference to an unindicted confederate must be granted.[30] Towards that end, this court orders that the words "named in Count Thirteen" be stricken from the Indictment.

---

29. Paragraph 12 of the Indictment is incorporated by reference in Counts XIII–XXIII.

30. The Government cites *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973) for the proposition that an indictment may charge conspirators and confederates who

were known. *Id.* at 687, 94 S.Ct. 3090. In *Nixon*, however, the defendant was not named as a co-conspirator in the indictment, but was referred to as such in the record. *Id.* at 687 n.4, 94 S.Ct. 3090.