UNITED STATES of America

v.

**YOUNG & RUBICAM, INC., Arthur R. Klein, Thomas Spangenberg, Arnold Foote, Jr., Eric Anthony Abrahams, and Steven M. McKenna.**

**Crim. No. N–89–68 (PCD).**

United States District Court,
D. Connecticut.

Feb. 7, 1990.

Robert J. Lynn, Asst. U.S. Atty., New Haven, Conn., Robert W. Werner, Asst. U.S. Atty., Hartford, Conn., for the U.S.

Thomas D. Barr, Allen F. Maulsby, Cravath, Swaine & Moore, New York City, Robert N. Chatigny, Hartford, Conn., John Martin, Shulte, Roth & Zabel, New York City, Robert White, of Murtha, Cullina, Richter & Pinney, Hartford, Conn., Elkan Abramowitz, Robert Anello, Obermaier, Morvello & Abramowitz, New York City, Hubert J. Santos, A. Susan Peck, Buckley & Santos, P.C., Hartford, Conn., Thomas Fitzpatrick, New York City, Charles Howard, James Bergenn, Hartford, Conn., for defendants.

RULING ON PENDING MOTIONS

DORSEY, District Judge.

On October 6, 1989, a grand jury charged the defendants in a three count indictment [1]. Count One charges Young & Rubicam ("Y & R"), Arthur R. Klein ("Klein"), and Thomas Spangenberg ("Spangenberg") with conspiracy to use the mails and other instrumentalities of interstate and foreign commerce to pay money to, or give things of value to Arnold Foote, Jr. ("Foote") and Eric Anthony Abrahams ("Abrahams") to influence them to use their positions and/or influence with the Jamaica Tourist Board ("JTB") to obtain and retain Y & R as their advertising agency, in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–2. Count Two charges Y & R, Spangenberg, Abrahams and Foote with conducting an enterprise's affairs through a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Count Three charges Steven McKenna ("McKenna") with perjury in his testimony before the grand jury on June 20, 1989. Defendants' pre-trial motions shall be discussed seriatim.

## 1. Motion to Dismiss Count Two

Klein, joined by Y & R, moves to dismiss Count Two for failure to allege conduct constituting predicate offenses. Y & R, joined by Klein, moves to dismiss Count Two on two grounds: (1) Count Two does not properly charge a "pattern of racketeering activity" or a racketeering "enterprise" under RICO and (2) the RICO statute, if applicable here, is unconstitutionally vague.

### (a) Predicate Acts

RICO, 18 U.S.C. § 1962(c), requires proof that defendants engaged in "racketeering activity." The predicate offenses alleged in Count Two are multiple violations of the Travel Act, 18 U.S.C. § 1952. Section 1961(1)(B) defines "racketeering activity" as including "... any act which is indictable under ... Title 18, United States Code:

... section 1952," the Travel Act. It is a violation of the Travel Act for any person to "[travel] in interstate or foreign commerce or [use] any facility of interstate or foreign commerce ... with intent to ... promote, manage, establish, carry on, or facilitate the promotion, ... of any unlawful activity...." 18 U.S.C. § 1952(a)(3). "Unlawful activity" is defined in § 1952(b)(2) as, *inter alia*, "... bribery ... in violations of the law of the state in which committed or of the United States...." The Travel Act violations alleged in Count Two are predicated upon conduct alleged to violate two bribery statutes: The Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–2, and the New York commercial bribery statute, N.Y. Penal Law §§ 180.00 and 180.05.

Klein claims that the FCPA cannot serve as a basis for a Travel Act violation, nor in turn as a predicate for a RICO violation. First, Klein argues that where conduct violates both a specific and a general statute, the government must prosecute the defendant under the more specific statute. *United States v. Henderson*, 386 F.Supp. 1048 (S.D.N.Y.1974) (mail fraud statutes inapplicable to tax evasion where more specific tax legislation proscribed the same conduct.) This case, however, has been rejected by the Ninth and Seventh Circuits and questioned by the Second Circuit. *See United States v. Miller*, 545 F.2d 1204, 1216 (9th Cir.1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); *United States v. Weatherspoon*, 581 F.2d 595, 599–600 (7th Cir.1978); *United States v. Mangan*, 575 F.2d 32, 49 n. 21 (2d Cir. 1978), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978). The mail fraud statute has been held to be a valid RICO predicate where tax fraud or other specific statutes would cover the same conduct. *See United States v. Busher*, 817 F.2d 1409, 1412 (9th Cir.1987); *United States v. Standard Drywall Corp.*, 617 F.Supp. 1283, 1295–96 (E.D.N.Y.1985).

■ A defendant may not be convicted and punished under two separate crimes for a single criminal act. *See Whalen v.*

---

**1.** On December 20, 1989, a superseding indictment was filed.

*United States*, 445 U.S. 684, 688, 100 S.Ct. 1432, 1435, 63 L.Ed.2d 715 (1980); *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955); *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Klein argues that proof of an FCPA violation would necessarily include proof of a Travel Act violation, a conviction under both would violate *Blockburger*. However, the indictment does not charge defendants with substantive violations of either FCPA or the Travel Act. Count Two alleges FCPA violations as a basis for Travel Act violations, which, in turn, are alleged as predicates for the RICO offense charged. If convicted, defendants would only be punished for the RICO offense.

Next, Klein accuses the government of bootstrapping a general statute into a RICO violation instead of using FCPA, the specific statutory scheme applicable to the defendants' conduct, because the FCPA, unlike the Travel Act, is not a RICO predicate. Klein argues that the use of a general statute as a RICO predicate instead of a specific statute applicable to defendant's conduct is improper. *See United States v. Santoro*, 647 F.Supp. 153, 167–169 (E.D.N.Y.1986), *aff'd*, 880 F.2d 1319 (2d Cir.1989). Having found no breach of duty to support a mail fraud prosecution, the court, in dictum, questioned the government's failure to charge the defendants with the various crimes more directly implicated, *id.* at 167, noting that none of such crimes were RICO predicates. *Id.* There is no claim here that defendants' conduct does not support a Travel Act violation[2].

The mail fraud statute may be a RICO predicate even though defendants' conduct may violate another, more specific statute which is not a RICO predicate. *See Busher*, 817 F.2d at 1412 (mailing of fraudulent

tax returns constitutes mail fraud RICO predicate even though tax fraud is not a RICO predicate); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1186–88 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (mail fraud and wire charges could be brought although conduct was also charged under False Claims Act); *United States v. Boffa*, 688 F.2d 919, 931–33 (3d Cir.1982) (mail fraud statute not preempted by labor statutes, despite overlap in coverage); *United States v. Hartley*, 678 F.2d 961, 990 n. 50 (11th Cir.1982), *cert. denied*, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983) (mail fraud not precluded as RICO predicate where conduct could be prosecuted under False Claims Act); *Standard Drywall*, 617 F.Supp. at 1295–96 (allowing mail fraud as RICO predicate based on fraudulent mailings related to tax liability).

Klein contends that, because Congress did not specify the FCPA as a predicate act, it should not be a basis for a Travel Act violation and thus, in turn, a predicate act as contrary to Congress' intention. Had Congress so intended, Klein argues, it would have added it as a predicate offense in one of the six amendments of the list. Klein also points to a Department of Justice policy not to charge tax crimes as mail frauds. Klein's argument is unpersuasive. Congress has not specifically restricted the Travel Act as a RICO predicate to cases where the underlying offense is also a listed RICO predicate. There is nothing in the language of RICO nor its history to suggest such an intention. To do so would unduly restrict the use of the Travel Act by limiting its use as a RICO predicate only when the alleged underlying "unlawful activity" was also, inde-

---

**2.** Klein does claim that an FCPA violation is not a proper basis for a Travel Act violation because it would lead to a *Blockburger* problem. As previously discussed, when the government has not sought to convict defendants of both an FCPA and Travel Act violation, there is no *Blockburger* problem. The conduct prohibited by the FCPA, corruption of a foreign official, constitutes bribery. *See United States v. Perrin*, 444 U.S. 37, 44, 100 S.Ct. 311, 315, 62 L.Ed.2d 199 (1979). Since the Travel Act defines "unlawful activity" as including bribery, an FCPA

violation falls within the meaning of conduct proscribed by the Travel Act. *See Perrin*, 444 U.S. at 50, 100 S.Ct. at 318 (violation of state commercial bribery statute was a proper basis for Travel Act convictions). *See also United States v. Biaggi*, 853 F.2d 89, 100–102 (2d Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989) (giving and receiving of gratuities in violation of 18 U.S.C. §§ 201(f) and (g) was within the Travel Act's definition of bribery).

pendently, a RICO predicate. Furthermore, the U.S. Attorney is required to obtain approval of a prosecution under FCPA and RICO from the Fraud and Organized Crime and Racketeering Sections of the Justice Department.

As the charged Travel Act violations were not improperly based on FCPA offenses, Klein's motion to dismiss on this ground is denied.

■ Nor are the violations of the New York commercial bribery statute[3], New York Penal Law §§ 180.00 and 180.05, an improper basis for Travel Act violations.

Klein claims that violation of the New York commercial bribery statute cannot support Travel Act violations because the New York statute applies only to commercial bribery and not bribery of public officials. Since the indictment describes Foote and Abrahams as "foreign officials" under the FCPA or as officials acting on behalf of the JTB, Klein contends they are not employees or representatives of a commercial business and §§ 180.00 and 180.05 do not apply. Klein points to the title of Article 180 which he claims unequivocally excludes public officials from its coverage by stating: "ARTICLE 180–BRIBERY NOT INVOLVING PUBLIC SERVANTS, AND RELATED OFFENSES."

Article 180 does not embrace bribery of "public servants." A separate section of the New York Penal Law governs bribery of public servants, § 200.00, *et seq.* However, foreign officials are not "public servants" within the meaning of that statute. Section 10.00(15) of the Penal Law defines a "public servant" as "any public officer or employee of the state or any political subdivision thereof or of any governmental instrumentality within the state." Since Abrahams and Foote are not "public ser-

vants" under the New York statute, Klein concludes that there is no section of the New York Penal Law which makes bribery of a foreign official a crime. Klein's argument is flawed because bribery of Abrahams and Foote, non-public servants, is not excluded from Article 180.

Article 180 is primarily concerned with bribery of persons who are not public servants. *See* Donnino Practice Commentary, N.Y. Penal Law, Article 180, at 357–58 (McKinney's 1988). "Bribery of persons who are public servants is proscribed by Article 200." *Id.* Although the title of the Article excludes bribery of New York public servants, the statutory language does not exclude bribery of other than New York officials by local private businesses. The statutory language, prohibiting bribery of "any employee, agent or fiduciary ... of ... [an] employer or principal," is sufficiently broad to include out-of-state public officials. §§ 180.00 and 180.05. New York Penal Law § 5.00 specifically states that provisions of the Penal Law are to be interpreted "according to the fair import of their terms to promote justice and effect the objects of the law" *See People v. Ditta,* 52 N.Y.2d 657, 439 N.Y.S.2d 855, 857, 422 N.E.2d 515, 517 (1981) ("conduct which falls within the plain, natural meaning of the language of a Penal Law provision may be punished as criminal").

To construct the statute to apply only to bribery of persons in private business is to suggest that State of New York intended not to prosecute instances of bribery occurring within its borders by New York corporations involving non-New York public officials. Such an interpretation would be inconsistent with the statutory purpose of prohibiting and punishing corruption of any commercial transaction within its borders.

---

**3.** Sections 180.00 and 180.05 provide:

§ 180.00 Commercial bribing in the second degree:

A person is guilty of commercial bribing in the second degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs.

§ 180.05 Commercial bribe receiving in the second degree:

An employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

Accordingly, Klein's motion to dismiss Count Two is denied.

### (b) Pattern of Racketeering

■ Violation of 18 U.S.C. § 1962(c) requires proof that defendants "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, ... conduct[ed] or participate[d], directly or indirectly, in the conduct of such an enterprise's affairs through a pattern of racketeering activity." "Racketeering activity" is defined in § 1961(5) as "at least two acts of racketeering activity ... occur[ing] within ten years" of each other. Y & R contends that the indictment pleads nothing more than a single bribe to obtain a single contract.

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the Supreme Court noted that two isolated acts of racketeering do not amount to a pattern. Quoting from a Senate Report, the Court concluded that the statutory definition of "pattern of racketeering" activity

> "required more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern."

*Id.*, quoting S.Rep. No. 91–617, at 158 (1969). Since *Sedima*, Circuit Courts split on the requirements of the "continuity plus relationship" test. *Compare United States v. Indelicato*, 865 F.2d 1370, 1381–84 (2d Cir.1989) (en banc) (proof of multiple schemes not required) *with Superior Oil Co. v. Fulmer*, 785 F.2d 252, 254–58 (8th Cir.1986) (requiring proof of multiple schemes).

The Supreme Court, while rejecting the Eighth Circuit's requirement of multiple schemes, approved and expanded on the "relationship plus continuity" concept. *H.J., Inc. v. Northwestern Bell Telephone Co.*, — U.S. —, 109 S.Ct. 2893, 2900–2901, 106 L.Ed.2d 195 (1989). Relationship exists in "criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise interrelated by distinguishing characteristics and ... not isolated events." *Id.*

> [Although continuity] may be [proven] ... in a variety of ways ... [it] is both a closed- and open-ended concept, referring either to a closed period of repeated conduct that by its nature projects into the future with a threat of repetition. *See Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (CA3 1987).... [continuity of] RICO's predicate acts ... and the relationship [they] must bear to one another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period of time by proving a series of related predicates extending over a substantial period of time ... [not] a few weeks or months ... [if] a RICO action is brought before continuity can be established this way ... liability ... [will depend on a showing of] the threat of continuity.

*Id.* 109 S.Ct. at 2901–2902.

Y & R's argument that continuity cannot be shown by a single bribe for a single contract is erroneous. The criminal conduct alleged in this case constitutes both continuity and relatedness. Contrary to Y & R's claim that the indictment alleges only two acts of racketeering, a violation of FCPA and New York commercial bribery statute, Count Two alleges thirty-three separate acts of racketeering. *See United States v. Briggs*, 700 F.2d 408, 417 (7th Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983) (each separate act of travel or use of an interstate facility constitutes a separate violation). Many of the acts alleged involve the same method of commission, use of a facility or instrumentality of interstate commerce, to further the kickback scheme. The participants are the same. The acts were allegedly perpetrated over a substantial period of time, well over five years.

Y & R's construction of the charges as one single bribe for the single purpose of obtaining one contract is too narrow. Nor does this case necessarily fall within the example in the Justice Department manual

referred to by Y & R.[4] The parties are not alleged to have agreed on a fixed sum as a bribe split into agreed upon installments. Count Two charges defendants with bribing foreign officials to obtain and retain the JTB account. ¶ I at 25. Count Two further charges defendants with bribing other conspirators to obtain their silence and thereby retain the contract. ¶¶ 16B, 22B. The alleged kickback payments were not installments of a single fixed bribe. Rather, they were separate payments, in amounts related to the amount spent by the JTB on advertising. ¶ 16B. These kickbacks were allegedly paid over a period of approximately five years to secure and retain the contract.

Similarly, the Third Circuit rejected the view that bribes paid to Nigerian officials to influence the award of a defense contract constituted a single payment separated into installments. *Environmental Tectonics v. W.S. Kirpatrick, Inc.*, 847 F.2d 1052, 1063 (3d Cir.1988), *cert. granted*, (limited to act of state question), — U.S. —, 109 S.Ct. 3213, 106 L.Ed.2d 563, *aff'd*, — U.S. —, 110 S.Ct. 701, 107 L.Ed.2d 816 (199). In *Tectonics*, the court stated that "... to focus only on the series of payments—i.e., one bribe divided into four parts—is to ignore the complexity of [defendant's] scheme. If appellant's allegations are true, a European conglomerate, and two American corporations—successfully, and over a two year period—organized to influence a foreign country's award of a procurement contract by illegal means." *Id.* The court, thus, concluded that the amended complaint alleged racketeering activity. *Id.*

Count Two properly pleads a pattern of racketeering activity in the form of a series of related predicate acts over a substantial period of time.

#### (c) *Existence of a Racketeering Enterprise*

Proof of a racketeering "enterprise" is a separate element of a RICO violation.

*United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). "When facing a RICO count in an indictment or complaint, a district court must determine whether it independently alleges both an enterprise ... and a pattern of racketeering activity ..." *Procter & Gamble v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990). However, "the proof used to establish these elements may coalesce" *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528; *See also Indelicato*, 865 F.2d at 1383 ("the nature of the enterprise may also serve to show the threat of continuing activity.").

"Enterprise" is defined in 18 U.S.C. § 1961 as "any individual, partnership corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." Count Two alleges an "enterprise" consisting of defendants Y & R, Klein, Spangenberg, Abrahams and Foote, 18 U.S.C. § 1961(4), a group of individuals and entities associated in fact although not a legal entity. ¶ 1.

Y & R argues that a unity of purpose between Y & R and its agents and employees, on the one hand, and Abrahams and Foote on the other, does not appear on the face of the indictment until after Y & R was awarded the contract. However, the indictment clearly alleges that the defendants arranged to pay kickbacks to Foote and Abrahams in return for being appointed and retained as the advertising agency for the JTB. Count One ¶ 4. That arrangement is not stripped of legal significance until its purpose is achieved. Y & R further claims that an enterprise cannot exist because the group association is not alleged to have had any purpose other than carrying out the alleged bribery. A RICO enterprise can consist of an organization

**4.** Department of Justice Manual, ¶ 9–110A.100, at 51 (1988) provides:

In a bribery case, the pattern will not be approved [by the Department of Justice] if all payments are installments of an agreed-upon

overall bribe; however, the pattern may be approved if the payments represent individual, separate transactions, as in a case where a public official requests more money to carry out further actions.

wholly criminal in nature and purpose. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528. Evidence which proves an enterprise need not be separate or distinct from that which proves a pattern of racketeering. *United States v. Mazzei,* 700 F.2d 85 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983) (the proof showed the existence of a group of bookmakers, middlemen and college basketball players who had associated for the purpose of illegally shaving points on games to maximize their chances of betting successfully). To impose a "distinctness" requirement in this case would mean that defendants are beyond the reach of RICO because they engaged solely in bribery and not other criminal acts. *Id.* at 89. Count Two properly charges a RICO enterprise.

Count Two has adequately alleged a pattern of racketeering and an enterprise and the motion as to this count is denied.

### (d) *Constitutionality of RICO as Applied*

Y & R claims that RICO fails to provide any meaningful guidance as to what constitutes a pattern of racketeering activity and is thus unconstitutionally vague. Y & R argues that the lack of minimal guidelines for enforcement as applied to this indictment violate Y & R's fifth amendment right to due process. Y & R relies heavily on the concurring opinion of Justice Scalia in *H.J., Inc.,* 109 S.Ct. at 2906, and concern that RICO may pose a danger of abuse by prosecutors, citing *United States v. Weisman,* 624 F.2d 1118, 1123 (2d Cir.1980), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); The Washington Post, Mar. 16, 1989, at A14. Further, Y & R claims the application of RICO in this case is unconstitutional because, *inter alia,* it improperly uses the FCPA as a RICO predicate. However, these arguments have been previously rejected as within the challenge to the sufficiency of the indictment.

The argument that RICO is unconstitutionally vague has been uniformly and squarely rejected. *See United States v. Huber,* 603 F.2d 387, 393 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312,

63 L.Ed.2d 759 (1980) (noting that other courts had dealt with the issue, the Court declined defendant's invitation to re-consider the constitutionality of RICO); *United States v. Tripp,* 782 F.2d 38, 41–42 (6th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1656, 90 L.Ed.2d 199 (1986); *United States v. Ruggiero,* 726 F.2d 913, 926 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Uni Oil, Inc.,* 646 F.2d 946, 949–53 (5th Cir. 1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982); *United States v. Morelli,* 643 F.2d 402, 412 (6th Cir.), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *United States v. Aleman,* 609 F.2d 298, 305 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Swiderski,* 593 F.2d 1246, 1249 (D.C.Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979); *United States v. Hawes,* 529 F.2d 472, 478–479 (5th Cir. 1976); *United States v. Campanale,* 518 F.2d 352, 364 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

In *Tripp,* the Sixth Circuit, noting the weight of authority upholding the constitutionality of RICO, rejected the argument that, by adopting state laws in defining "racketeering activity," RICO fails to provide fair notice of its application. 782 F.2d at 42 (defendant did not allege that the state offenses involved were void for vagueness). Y & R does not claim that the Travel Act, FCPA or New York Penal Law 180.00 and 180.05 are unconstitutionally vague. *See also Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) ("Given that the RICO statute totally encompasses the obscenity law [RICO predicate], if the latter is not unconstitutionally vague, the former cannot be vague either."). The RICO statute is not unconstitutionally vague as applied in this case.

Accordingly, Y & R's motion to dismiss Count Two is denied.

### 2. Motion to Dismiss Count One as Duplicitous

■ Defendant Spangenberg, joined by Klein and Y & R, move to dismiss Count

One as duplicitous. Defendant McKenna, joined by Klein, moves to dismiss paragraph 80 as not properly included in count one.[5] Defendants claim Count One should be dismissed because it alleges subsequent acts of concealment, including perjury and obstruction. ¶¶ 78, 79, 80.[6]

Relying on *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), defendants argue that count one alleges acts of concealment distinct from the alleged underlying criminal conspiracy. *Grunewald* involved a conspiracy to fix tax fraud cases wherein defendants, for cash, undertook to prevent criminal prosecution of taxpayers. *Id.* at 395, 77 S.Ct. at 969. Defendants succeeded in obtaining "no prosecution" rulings in 1948 and 1949, but a congressional committee investigation ensued. *Id.* Certain conspirators attempted to conceal their criminal activity from the committee. The tax conspiracy indictment was returned after the statute of limitations had run. *Id.* at 396, 77 S.Ct. at 969. The Supreme Court rejected the government's argument that the acts of concealment were part of the original conspiracy and thus the indictment was timely[7]. *Id.* at 399, 77 S.Ct. at 971 citing *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). The Court stated that

> [t]he crucial teaching of *Krulewitch* and *Lutwak* is that after the criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.

*Grunewald,* 353 U.S. at 401–402, 77 S.Ct. at 972. However, the Court cautioned that

> [b]y no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy … a vital distinction must be made between the acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Id.* at 405, 77 S.Ct. at 974.

The *Grunewald* prohibition does not apply here because the acts of concealment were allegedly committed in furtherance of the underlying conspiracy. Defendants argue that the conduct occurred after the principal objects of the alleged conspiracy had been accomplished. Whether acts can be construed as committed in furtherance of the conspiracy or only for purposes of concealment depends on the objectives of the conspiracy. The ultimate question of whether the evidence supports one or more conspiracies is a question of fact for the jury. *United States v. Finkelstein,* 526 F.2d 517, 522 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). Thus, the present inquiry is limited to the facial sufficiency of the indictment alleging concealment as one of the objects of a single conspiracy.

The indictment alleges a conspiracy by defendants Y & R, Klein, Spangenberg and others, to obtain and retain the JTB account for Y & R. ¶ 2. As part of the conspiracy, the indictment charges Y & R with entering into a contract with Ad Ventures, Ltd., to funnel kickbacks to Foote and Abrahams without detection. ¶ 7. It further alleges that "[i]t was … part of the conspiracy that the conspirators would

---

5. Paragraph 80 is the same as paragraph 81 of the original indictment. Hereinafter all paragraph references will be to the superseding indictment.

6. Paragraphs 78 and 79 charge Spangenberg and Foote with making false statements to special agents of the Internal Revenue Service regarding alleged payments by Y & R to Jamaican officials and/or Ad Ventures, Ltd. and paragraph 80 charges McKenna with falsely testifying to the grand jury that he never discussed with other Y & R employees that Y & R was making payments to Abrahams or that Y & R's contract with Ad Ventures was a front for kickback payments.

7. Although *Grunewald* involved a statute of limitations question, its analysis is applicable here. *United States v. Marcus Schloss & Co.,* 710 F.Supp. 944, 946 (S.D.N.Y.1989).

and did employ various other means and devices to conceal and cover up their unlawful activities, including making false statements to government investigators, testifying falsely before the grand jury ..." ¶ 10. In addition, the indictment contains many allegations of specific instances in which the defendants and other conspirators engaged in activity designed to conceal the conspiracy and retain the contract. ¶¶ 19, 20, 21, 26, 32, 33, 34, 35, 36, 37, 38, 41, 44, 45, 46, 47, 48, 52, 61, 62, 63, 64, 78, 79, and 80.

Defendants claim the principal objects of the alleged conspiracy had been accomplished before Spangenberg or Foote allegedly lied to IRS agents and three years before McKenna allegedly falsely testified before the grand jury[8]. According to defendants, the purported conspiracy ended with Y & R's last payment on September 3, 1986, ¶ 77, and the commencement of the grand jury investigation on September 11, 1986. However, as the government points out, defendants' prior agreement to conceal the true nature of the circumstances surrounding Y & R's obtaining and retaining of the JTB account was ongoing and necessary at the time of the grand jury investigation for the retention of the account and its accorded benefits.

The indictment charges defendants with conspiring to bribe Abrahams and Foote to assist Y & R in obtaining and retaining the JTB account. Y & R's relationship with the JTB was not severed until after the Grand Jury returned the indictment. At least up until September 3, 1986, Y & R allegedly made installment payments in order to retain the contract. ¶ 77. The computation of the kickbacks was based on the amount of money spent on advertising by the JTB as reflected by the Y & R billings. ¶¶ 54, 55, 36. Concealment of the purported scheme was necessary to avoid detection and ensure retention of the account, i.e., that Y & R's contract would run its course.

*See United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir.1982) (a conspiracy continues until the conspirators receive their anticipated economic benefits). The indictment alleges that to further that objective, Spangenberg and Foote lied to IRS investigators on September 15, 1986 and September 29, 1986 respectively. As a matter of pleading, the indictment properly alleges that the three acts of concealment were part of a single conspiracy to obtain and retain the JTB account.

This conclusion is consistent with *Grunewald,* which accepted the theory that the main objective of the conspiracy was not merely to obtain the "no prosecution" rulings in 1948 and 1949 but to obtain final immunity from tax prosecution which was not accomplished until 1952 when the statute of limitations ran on those offenses. 353 U.S. at 408, 77 S.Ct. at 975. Thus, the Court concluded that the acts of "concealment occurring after 1949 could easily have been motivated at least in part by the purpose of the conspirators to deliver the remaining 'installments' owing under the bargin—to wit, the safeguarding of the continued vitality of the 'no prosecution' rulings." *Id.* at 409, 77 S.Ct. at 976. *See also United States v. Potamitis,* 739 F.2d 784, 788 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984) ("consistent with *Grunewald,* the jury could infer from the evidence that acts to conceal and divide the proceeds were part and parcel of a single scheme to rob Sentry"); *Mennuti,* 679 F.2d at 1035 (conspiracy did not end until conspirators received their payoffs); *cf. Marcus Schloss & Co.,* 710 F.Supp. at 949–950 (Insider trading conspiracy ended with the arrest of two defendants on March 26 and 27 and a new "conspiracy [to obstruct SEC investigation] described in paragraph 15 of the indictment was hatched in [defendant's] apartment on March 26.").

The government theorizes that the objective of the conspiracy was to obtain and

---

8. Klein also argues that there is no allegation in the indictment that he participated in the perjury. However, if the acts of concealment were part of a single conspiracy and Klein is shown to be a member of it, it does not matter that Klein lacked specific knowledge of what each

conspirator was doing at a given time. *Marcus Schloss & Co.,* 710 F.Supp. at 947; *see also, United States v. Teitler,* 802 F.2d 606, 615 (2d Cir.1986) ("participation in a series of transactions does not require participation in each transaction").

retain the JTB account and defendants' acts of concealment were intended to further that purpose. Thus, from the outset, the purpose of the conspiracy was to obtain for Y & R a contract which would continue over a period of time. To achieve the opportunity for Y & R to carry out that contract until its completion, a course of conduct is alleged which, by concealing the alleged kickback scheme, would permit Y & R to perform the contract and receive the promised payments. Y & R's ceasing of payments would not terminate the conspiracy, which would not be brought to total fruition until the contract performance was completed.

Accordingly, defendants' motion to dismiss paragraph 80 and count one is denied.

3. Motion to Dismiss the Portion of Count One Alleging a Conspiracy to Make Payments to Eric Anthony Abrahams

Klein, joined by Y & R, moves to dismiss the charge of conspiracy to make payments to Abrahams on the ground that prosecution of that aspect is time-barred. A conspiracy charge is timely if it alleges the commission of at least one overt act in furtherance of the conspiracy within the applicable statute of limitations, five years in this case. *Grunewald*, 353 U.S. at 396–97, 77 S.Ct. at 969–70; *United States v. Brasco*, 516 F.2d 816, 818 (2d Cir.), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). Defendants argue that Abrahams ceased to be Jamaica's Minister of Tourism more than five years prior to the return of the indictment. They further point to the Grand Jury testimony of Edward Daley, an employee of Y & R, that in August of 1984 Abrahams told him:

If you have to get back to New York, I want you to do that, I want [Ad Ven-

tures] shut down and I don't want you to leave the island until you come back and confirm with me that has been done.
Transcript of Edward Daley's Grand Jury Testimony, September 19, 1989 at 43–46. According to defendants, Abrahams withdrew thus from the conspiracy more than five years prior to the indictment.

The argument is without merit. Whether Abrahams withdrew from the conspiracy is a question of fact for the jury.[9] *See United States v. United States Gypsum, Co.*, 438 U.S. 422, 463–465, 98 S.Ct. 2864, 2886–2888, 57 L.Ed.2d 854 (1978); *United States v. Lowell*, 649 F.2d 950, 956 (3d Cir.1981). Nor does Abrahams' resignation as Minister of Tourism necessarily end the alleged conspiracy or his participation in it. The indictment charges overt acts committed in furtherance of a single conspiracy[10] from 1984 until 1989. ¶¶ 74–80. The allegation of overt acts committed within five years meets the requirements of the statute of limitations.

Accordingly, defendants' motion to dismiss from Count One the allegation of payments to Abrahams is denied.

4. Motion for Severance

Klein and Y & R move for severance of McKenna and Count Three on the ground of improper joinder, Rule 8(b), Fed.R. Crim.P., which provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

---

**9.** It is relevant to note that the government disputes the significance and effectiveness of Abrahams statement, citing Transcript of Edward Daley's Grand Jury Testimony, dated September 19, 1989, at 43–46 and *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) ("Defendant must show more than a mere cessation of activity ...; there must [also] be affirmative action, either the making of a clean breast to the authorities ... or communi-

cation of the abandonment in a manner reasonably calculated to reach co-conspirators. And the burden of establishing withdrawal lies on the defendant."). The effectiveness of Abrahams' "shut-down" order is further questioned by the post 1984 allegations of further payments of to Ad Ventures. ¶¶ 74, 75, 76, 77.

**10.** These acts were properly pled as part of a single conspiracy. *Supra.*

Klein argues that the inclusion of McKenna's perjury charge as an overt act was improper under *Grunewald* and thus the scheme cannot be deemed to charge all of the defendants with McKenna's alleged perjury. Whether McKenna's alleged perjury was properly alleged as part of a single conspiracy has already been addressed. Accordingly, defendants' motion to sever Count Three as improperly joined is denied.

■ In addition, pursuant to Rule 14, Fed.R.Crim.P., all defendants move for severance of Count Three. Rule 14 states that

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

Severance motions fall within the sound discretion of the district court. *United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir.), *petition for cert. filed*, 1989 WL 129717 (U.S. Oct. 13, 1989), citing *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

■ To succeed on a motion to sever, defendants must meet the heavy burden of showing that a joint trial would severely prejudice defendants so as to deny them a constitutionally fair trial. *Tutino*, 883 F.2d at 1130; *See also Potamitis*, 739 F.2d at 790; *United States v. Gallo*, 668 F.Supp. 736, 749 (E.D.N.Y.1987), *aff'd*, 863 F.2d 185 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). "Merely establishing that a defendant would have had a better chance for acquittal at a separate trial is not sufficient to show substantial prejudice." *Tutino*, 883

F.2d at 1130, citing *Friedman*, 854 F.2d at 563; *Potamitis*, 739 F.2d at 790.

Whether prejudice amounts to a "miscarriage of justice" requires consideration of the following factors:

> the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount and type of proof offered against the defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant.

*Gallo*, 668 F.Supp. at 749.

■ McKenna claims that he will be greatly prejudiced if he is only tried for perjury [11] while the other defendants are charged with conspiracy and RICO. Joinder of underlying substantive crimes with perjury counts, where the false statements concern the substantive offenses is proper. *Potamitis*, 739 F.2d at 791. McKenna contends that Counts One and Two do not describe him as a member of the conspiracy. He claims four of the eight overt acts in which he is named allege purely ministerial acts which were facially innocent and commensurate with his duties at Y & R. In essence, McKenna argues that he is charged with a separate and different crime occurring three years after the purported conspiracy and should be tried separately. The indictment has been found proper in charging McKenna's alleged perjury was an overt act in furtherance of the conspiracy. Whether that is true or if it was a separate offense will be determined by the jury. It is sufficient that the indictment alleges overt acts by McKenna committed in furtherance of the conspiracy. ¶¶ 42, 43, 45, 49, 59, 64, 80.

McKenna further claims the length of the trial, number of defendants, the number of counts, and complexity of the indictment demonstrates McKenna would suffer

---

11. McKenna is described in the two substantive counts as a participant. The government claims that it did not seek his indictment in Counts One and Two because he testified before the Grand Jury under a grant of immunity and evidence derived therefrom cannot be used in subsequent criminal proceedings.

"substantial prejudice" from a joint trial. This case is not so complex as to make it impossible for the jury to sort out the evidence among the defendants. The case involves four defendants[12] and three counts alleging a single conspiracy to bribe foreign officials. The parties estimate the trial will last approximately three to six weeks. *See Tutino,* 883 F.2d at 1132 (a seven week trial with four defendants and four counts was not too massive to preclude the jury from distinguishing evidence admissible against some but not all defendants); *cf. Gallo,* 668 F.Supp. at 750 (case involving fourteen defendants and twenty two counts).

Nor does the claimed disparity in the amount of evidence to be offered against the different defendants justify severance. "Differences in the amount of proof are inevitable in multi-defendant trials, and are not in themselves a ground for severance." *Tutino,* 883 F.2d at 1132. McKenna suggests a great risk of prejudicial spillover from the more damaging evidence to be offered against other defendants. The government contends that the evidence admitted against other defendants will overlap with the evidence admitted against McKenna. For example, to establish the materiality of McKenna's false statements to the grand jury, the government intends to introduce evidence of the nature and scope of the charges in Counts One and Two which were the subject of the grand jury investigation. *Accord United States v. Guerrerio,* 670 F.Supp. 1215, 1224 (S.D. N.Y.1987). To the extent evidence is not admissable against McKenna, the jury will be instructed accordingly. There is a strong presumption that juries can and will follow instructions to consider evidence separately as to the various defendants in a case. *United States v. Teitler,* 802 F.2d 606, 617 (2d Cir.1986); *Tutino,* 883 F.2d at 1132.

While conceding that it is premature to determine whether a conflict in defense theories or trial strategies will develop, McKenna claims that the potential for such conflict is "glaringly apparent." McKenna "must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." *Id.* at 1130. Prediction of potential conflict is insufficient.

McKenna has not shown substantial prejudice to overcome the judicial economy served by a consolidated trial, including the burden of separate trials and resulting inconvenience to witnesses. McKenna's motion for severance is denied.

Klein argues that he will be prejudiced by a joint trial which "would include evidence relating to the highly emotional issue of whether McKenna lied to the grand jury and attempted to obstruct its investigation." Memorandum in Support of Klein's Motion to Dismiss at 42. Klein argues that the alleged perjury was not related to the conspiracy. For the reasons previously discussed and the finding of a proper relationship between the perjury and the conspiracy, this motion is denied.

Spangenberg argues that the statements made by McKenna to the grand jury inculpate him and if admissible would deprive him of the confrontation clause rights under the Sixth Amendment in violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* held it unconstitutional to introduce statements of a codefendant in a joint trial which are incriminating as to another defendant and which would not be admissible in a separate trial against that defendant. According to Spangenberg, the statements may be admissible in a joint trial as an admission of a party opponent but would be inadmissible hearsay in a separate trial. Spangenberg claims that since McKenna is unlikely to testify at trial, he will be deprived of his right to confront this witness. At this stage, it is speculation whether McKenna will testify.

The government claims that *Bruton* does not apply since the statements are admissible against Spangenberg under Rule 801(d)(2)(E), Fed.R.Evid., which provides;

---

**12.** Defendants Foote and Abrahams have not appeared.

(d) *Statements Which Are Not Hearsay* —A statement is not hearsay if ... (2) the statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

To admit the statements against Spangenberg, the government must establish an evidentiary basis for admission as statements by a co-conspirator during the course and in furtherance of the conspiracy. Thus, the government is incorrect when it claims that a *Bruton* problem does not exist. If the government does not provide a foundation for admission of the statements and McKenna does not testify at trial, a *Bruton* violation would occur. Absent such a foundation, the statements would not be admitted. Even if admitted solely against McKenna, the possibility of redaction and a cautionary instruction can protect Spangenberg. At this stage, it is premature to grant the motion for severance on this ground. Accordingly, defendants' motion for severance is denied.

### 5. *Motion for Expungement*

 McKenna moves that his name be expunged from Counts One and Two [13]. He claims the indictment violates his due process rights by naming him in both counts without charging him therein. McKenna is mentioned in several overt acts. ¶¶ 42, 43, 45, 46, 49, 56, 59, 64, and 80 of Count One and in the racketeering acts 15 and 23 of Count Two.

McKenna contends that he is constitutionally entitled to be free of accusations to which he is not given an opportunity to respond. *United States v. Briggs*, 514 F.2d 794, 803 (5th Cir.1975) (grand jury lacks authority to accuse persons of a crime without naming them as defendants); *Application of United Electrical Workers of America*, 111 F.Supp. 858, 866 (S.D.N.Y. 1953). The *Briggs'* court "reached its conclusion based upon the principle that 'a man should not be subject to a quasi-offi-

cial accusation of misconduct which he cannot answer in an authoritative forum' because he has not been indicted as a defendant." *United States v. DePalma*, 461 F.Supp. 778 (1978), citing *Briggs*, 514 F.2d at 802, quoting *United Electrical*, 111 F.Supp. at 867–868.

Relying on *DePalma*, McKenna argues that the fact that he has been indicted in one count does not affect his right to expungement from the other two counts. In *DePalma*, the court ordered the phrase "and their confederates named in Count Thirteen" stricken from Count One because it indicted them as defendants in that count and "accuse[d] these persons of [a] crime while affording them no forum in which to vindicate themselves." *Id.* at 800, citing *United Electrical*, 111 F.Supp. at 867–868.

*DePalma* is distinguishable from this case. In *DePalma*, some of the defendants charged with conspiracy to defraud the legitimate creditors of the Theatre (Count Thirteen) were incorporated by reference into Count One alleging the substantive crime of defrauding the creditors. *Id.* The defendants not charged with the substantive offense but only as members of the conspiracy would not have an opportunity to deny involvement in the substantive offense. Their defense would focus on denial of their participation in the conspiracy not the underlying offense. McKenna, on the other hand, will have an opportunity to challenge his membership in the conspiracy by countering the charge that he committed perjury in furtherance of the conspiracy. Further, evidence of McKenna's alleged participation in the conspiracy and the nature of the conspiracy will be offered to prove the materiality of his perjury. McKenna may then seek to vitiate the charges that he was a member of the conspiracy and committed overt acts in furtherance of it. McKenna is not denied a forum to vindicate the charges against him nor is he deprived of his due process rights in view of the nature of the charges

---

**13.** McKenna concedes that under *Briggs,* "the government may introduce evidence at trial of a person's participation in a conspiracy and thereby ascribe his acts and statements to the co-conspirators even if that person is not named in the indictment." 514 F.2d at 804–805. Although the identity of the unindicted co-conspirator then would be unmasked, the allegations would "... not carry the imprimatur of credibility that official grand jury action does." *Id.*

against him in Count Three. The jury will be clearly instructed, if requested, to limit their consideration of McKenna's guilt to the elements of perjury and the proof thereof.

Accordingly, McKenna's motion for expungement is denied.

6. Motion for Bill of Particulars

Defendants Y & R, Klein, Spangenberg, and McKenna each move for a bill of particulars requesting specific information as to particular allegations. McKenna's motion is denied as moot in view of the government's responses. For reasons discussed below, the motion is denied with respect to the remaining defendants.

■■■■ A bill of particulars provides facts, in addition to those alleged in the indictment, that are necessary to apprise a defendant of the charges against him with sufficient precision to enable him to prepare for trial, to avoid or minimize unfair surprise, and to plead double jeopardy in bar of future prosecution for the same offense. *Wong Tai v. United States*, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987); *United States v. Biaggi*, 675 F.Supp. 790, 809 (S.D.N.Y. 1987); *United States v. Connery*, Civil No. H–88–4, —— WL —— (PCD) (D.Conn. May 4, 1989), Ruling On Motion For Bill Of Particulars at 1. A bill of particulars is appropriate only "where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Matos–Peralta*, 691 F.Supp. 780, 791 (S.D. N.Y.1988), citing *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977).

■■■■ However, a bill of particulars is not intended to give a preview of the case or unduly restrict the government's presentation of its case or unduly restrict the government in presenting its proof at trial. *Connery*, Ruling at 2; *see also, United States v. Feola*, 651 F.Supp. 1068, 1133 (S.D.N.Y.1987), *aff'd without op.*, 875 F.2d 857 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 110, 107 L.Ed.2d 72 (1984); *Ma-*

*tos–Peralta*, 691 F.Supp. at 791. "The ultimate test must be whether the information sought is necessary, not whether it is helpful." *Matos–Peralta*, 691 F.Supp. 791. In determining whether the information sought is necessary, the court must consider whether it has been or can be obtained through discovery under Fed.R.Crim.P. 16 and/or the Local Standing Order on Discovery, and the indictment. *Feola*, 651 F.Supp. at 1133.

Defendants request information with respect to the alleged conspiracy and specifically: (1) the facts which support the allegation that Mr. Foote was foreign within the meaning of the FCPA; (2) the facts which form the basis of the government's allegations that defendants conspired to violate the FCPA, including when and where defendants joined the conspiracy. Spangenberg also requests information on whether he is charged as a principal or as an aider and abettor in each racketeering act alleged in Count Two.

■■■ To require · specification of the "formation of the conspiracy, the place and date of each defendant's entrance into the conspiracy, the substance or a copy of the conspiracy, and specification of the manner in which the conspiracy operated would unduly restrict the government's proof at trial." *United States v. McCarthy*, 292 F.Supp. 937, 940 (S.D.N.Y.1968); *see also Feola*, 651 F.Supp. at 1132–33; *Connery*, Ruling at 4. It is sufficient that an indictment charging conspiracy state the elements of the offense charged. *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974).

■■■ The indictment, which alleges seventy one specific overt acts and thirty three specific acts of racketeering has detailed the allegations sufficiently to apprise defendants of the nature of the charges against them. Adequate notice of the manner in which Mr. Foote obtained his status as a "foreign official" is also provided.

Indictment ¶ 1f [14]. Spangenberg's request that the government disclose whether he is being charged as a principal or aider and abettor in each racketeering act alleged is improper. The government is not "required to disclose the manner in which it will attempt to prove the charges," *McCarthy*, 292 F.Supp. at 940, or the precise manner in which the crimes charged in the indictment were committed. *Biaggi*, 675 F.Supp. at 809.

In compliance with discovery procedures in Rule 16, Fed.R.Crim.P., the government has provided additional information concerning the proof. It is unnecessary to require the government to set out in a bill of particulars what has already been given or is required to be given in discovery, *Connery*, Ruling at 4, and to require further disclosure unduly restricts the government's proof at trial.

Defendants' motions for bills of particulars are denied.

### 7. Spangenberg's Motion for Discovery

Spangenberg's motion to produce all notes of any statements made by Spangenberg is denied as moot in view of the government's disclosure of any notes it intends to offer in evidence.

### 8. Motion to Strike Paragraph 11 of the Indictment

Klein, joined by Y & R, moves to strike paragraph 11 [15] on the grounds of irrelevance, immateriality, inadmissibility, and undue prejudice against all defendants other than Abrahams. While reserving its right to argue the admissibility of this evidence, the government does not oppose this motion. As the government has withdrawn this paragraph from the superseding indictment, the motion is denied as moot. Admissibility of the evidence if offered will be decided at trial.

### 9. Y & R's Motion for Disclosure

Y & R moves to require the disclosure of the statements made by Myron Slosberg ("Slosberg") and William Appelman ("Appelman") and all inconsistent statements by or concerning the testimony of potential government witnesses.

Y & R claims that, pursuant to Rule 16(a)(1)(A), it is entitled to obtain the statements made by its former employees, Slosberg and Appelman, to the grand jury. In addition, Y & R contends that since Y & R can only speak through its agents, the statements made by Slosberg and Appelman constitute "statements made by a defendant" and "[r]ecorded grand jury testimony of the defendant" which must be produced under the court's Standing Order on Discovery. The government argues that the 1975 amendment to Rule 16(a)(1)(A), adding subsection (2), limited the discoverability of the statement of former officers or employees of a corporation. Subsection (2) pertains to officers or employees, who, at the time of the offense, were "personally involved in the alleged conduct constituting the offense and so situated as an officer and employee as to have been able legally to bind the [defendant in] respect to that alleged conduct in which the witness was involved." Fed.R.Crim.P. 16(a)(1)(A)(2).

 It is in the sole discretion of the court whether to permit disclosure of the

---

**14.** Paragraph 1f provides in part:
Arnold Foote, ..., was a prominent Jamaican citizen with close political ties to the Jamaican Labor Party and to the Administration of Prime Minister Edward Seaga. Foote served as executive chairman of Martin's Travel, an instrumentality of the government of Jamaica, and he also acted in an official capacity on behalf of the Minister of Tourism and the Jamaica Tourist Board....

**15.** Paragraph 11 of the indictment stated:
In or about October, 1980, the exact date being unknown to the Grand Jury but subsequent to his appointment as Minister of Tourism for Jamaica, Eric Anthony Abrahams summoned an executive of the advertising agency which then held the Jamaica Tourist Board account and demanded to know the process by which kickbacks had been paid to officials in the prior Manley Administration. When informed by this executive that no kickbacks had been paid in the prior Administration, Abrahams stated that 'things may be different in the new Administration,' or words to that effect.

grand jury testimony. *United States v. Twentieth Century–Fox Film Corp.*, 700 F.Supp. 1242, 1244 (S.D.N.Y.1988), *aff'd in part, vacated in part*, 882 F.2d 656 (2nd Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990) (Disclosure of the testimony of the employees conditioned upon stipulation by defendant that "employees were able to legally bind the corporation."). Slosberg was promoted in 1980 to President and Chief Operating Officer of Wunderman, Ricotta & Kline, Inc., then a wholly owned subsidiary of Y & R. In 1980, Appelman became Vice President and Associate Creative Director of Young & Rubicam New York ("Y & R NY") and in 1983 Senior Vice President and Group Creative Director of Y & R NY. Both officers participated in the preparation and presentation for the JTB account and travelled to Jamaica. As senior officers of Y & R, Y & R claims they were so situated as to have been able to legally bind the corporation.

According to the government, Slosberg and Appelman's conduct was not creative of culpability on the part of Y & R. Rather, they were observers of defendants' conduct and pawns of the conspirators. While denying its veracity, Y & R points to the testimony of a government key witness, Robin Moore, wherein he discusses Slosberg's involvement in this case as follows:

> A neighbor of mine in Westport, Michael Slossberg, ... was then associated with a mail order advertising agency named Wunderman, Ricata, and Klein. When in February of 1981 Arnold Foote was visiting me I took him to Slossberg's home for Sunday breakfast and a discussion of the Jamaica account. At the end of the meeting I was convinced that Mike Slossberg would in no way be able to handle the account and forgot the whole thing. A couple of weeks later Slossberg called me and said that his agency was affiliated with Young & Rubicam and Y & R was interested in the account.
>
> I had another meeting with Slossberg alone at his home told him that Arnold Foote owned an advertising agency in Kingston which at the time was not doing business although it was a legal corporate entity. I went on to say that the Minister of Tourism, Tony Abrahams, would have the final say on what agency got the account and that at the moment he would be swayed by Arnold Foote in making that decision. I also told Slossberg that out of the 15% commission paid to Y & R by the Jamaican government, if 5% were paid to Arnold Foote, Arnold would render creative services and also take care of Tony Abrahams and see to it that Y & R got the account.

This evidence suggests that, if he acted on Moore's observation, Slosberg was personally involved in the alleged wrongful conduct. If that was the case, his position as a senior officer of Y & R would legally bind Y & R in respect to the alleged conduct. Other than stating in conclusory form that Slosberg was not personally involved in the alleged conduct constituting the offense, the government has not shown how Slosberg was a mere observer of defendants' conduct and did not so act. The motion is, therefore, granted with respect to Slosberg's testimony. The government shall produce such testimony within ten (10) days hereof.

There is no evidence in the record to suggest that Appelman committed any of the alleged wrongful conduct. His participation in the presentation to the JTB does not involve him in the conspiracy. The motion is denied with respect to Appelman.

Defendants also move for disclosure of all inconsistent and contradictory statements made by potential government witnesses based on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The prosecution must disclose "not only exculpatory evidence, but also evidence that may be used to impeach a government witness." *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). Despite the court's Standing Order for Discovery (¶ (A)(10)–(11)) requiring disclosure of such material within ten days of the arraignment, defendants claim the government has taken the

position that only a single example of the inconsistency need now be produced. Therefore, not wishing to rely on the government's determination of which statements are the same and need not be disclosed, defendants move for disclosure of all the statements.

The government claims it has produced all portions of any statements that contain information favorable to defendants, but has not yet disclosed portions of statements that are inculpatory. The government sees defendants as seeking to avoid the restrictions of the Jencks Act [16] by including what is actually *Jencks* material into the parameters of *Brady*.

In view of the government's representation that it has disclosed all exculpatory portions of any statements and that it will disclose all witnesses' *Jencks* material in advance of their testimony at trial, the motion is denied.

### 10. Government's Motion for Disclosure of Evidence by the Defendants

The government moves, pursuant to Rule 16(b), Fed.R.Crim.P., Subsection (B) of the Standing Order on Discovery, for an order directing Y & R, Klein, Spangenberg and McKenna to provide: (1) the nature of their respective defenses; (2) any documents which the defendants intend to introduce as evidence-in chief at trial for inspection and copying by the government; (3) reports of any physical or mental examinations and of scientific tests or experiments which defendants intend to offer as evidence at trial; (4) a witness list.

Defendants have complied with (1) and (2), as to which the motion is denied as moot. Defendants claim that neither the witness list, naming 57 individuals and entities, nor the 140,000 pages of documents provided by the government enlighten them as to what will happen at trial. Contrary to defendants' characterization, the government is not requesting a committed

list of exhibits and witnesses, but, like that provided to defendants, a list of witnesses and documents defendants have a reasonable basis to believe they may offer at trial. As defendants have not submitted a stipulation which they have suggested was in process to resolve these matters, defendants shall comply with the requests as follows:

1. Within ten (10) days of this order, defendants shall list and make available for inspection and copying by the government all documents which they have reason to believe they may introduce as evidence at trial and which have not already been provided.

2. Within ten (10) days of this order, defendants shall provide to the government a list of those witnesses whom they reasonably believe they may call.

### 11. Motion for Leave to Make Opening Statement

■ The government moves, pursuant to Local Rule 12(e), for leave to make an opening statement. Rule 12(e), which is applicable in this case through Rule 1 of the Local Rules of Civil Procedure, provides that:

Opening statements by counsel in jury trials are not allowed, except on application made to the presiding Judge out of the hearing of the jury.

"An opening statement is a matter for the discretion of the court." *United States v. Evans*, 629 F.Supp. 1544, 1546 (D.Conn. 1986), citing *United States v. Salovitz*, 701 F.2d 17, 20 (2d Cir.1983). The exercise of the court's discretion in determining whether to allow an opening statement, "must be guided by the purpose of a trial; to permit a [party] a fair opportunity to present its case. *Id.*

The government claims that the complexity of this case, both factually and legally, as well as the nature of the evidence to be presented warrant the need for opening

---

**16.** 18 U.S.C. § 3500 provides in part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective

Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

statements. First, the government argues that the term "foreign official" as defined in the FCPA has a meaning broader than the ordinary meaning of the phrase. Without categorizing the evidence for the jury, the government claims the jury might misinterpret the significance of the evidence. This amounts to a request to make a legal argument during opening statement which is precisely what should be avoided in opening statements. *Id.* at 1547.

Second, the government contends that a substantial portion of its case depends on "a complex confluence of circumstantial evidence" which the jury may not understand if it is not allowed to make an opening statement. However, "a mere recitation" of what evidence is going to be presented does not necessarily "help jurors better understand the evidence when it is introduced." *Id.* To go beyond that would risk stepping into the realm of legal argument which is not allowed.

Finally, the government claims that it should be allowed to make an opening statement in order to explain to the jury that some of its witnesses may be hostile. This is insufficient to justify granting leave to make an opening statement. Not only can the government elicit this information on direct examination, the court can generally instruct the jury that the mere fact a party calls a witness does not mean the witness is aligned with that party. An opening statement is not intended to be an argument. It can, too readily, slide into an argument.

As the reasons cited by the government do not warrant the risks noted, its motion for leave to make an opening statement is denied. The government, and defendants, may submit whatever introductory statements they feel are proper, and, as same may fairly and justly introduce the case to the jury, they will be incorporated in the court's opening instructions.

SO ORDERED.